(No. 73630.

HEATHER CATES, a Minor, *et al.*, Appellees, v. TIMO-
THY CATES *et al.*, Appellants.

*Opinion filed August 26, 1993.*

HARRISON, J., took no part.
MILLER, C.J., dissenting.

Theodore J. MacDonald, Jr., and J. Todd Hayes, of
Burroughs, Hepler, Broom, MacDonald & Hebrank, of
Edwardsville, for appellants.

Rhonda D. Fiss, of Neubauer & Fiss, of Fairview
Heights, for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

On June 9, 1985, Heather Cates, aged 4 years, was a passenger in an automobile driven by her father, Timothy Cates. At the time, Cates was transporting his girlfriend, her minor son and Heather to his home for the evening. As Cates' auto approached an intersection of two State highways, it collided with an automobile driven by Phillip Darwin. Heather was seriously injured as a result of the accident. At the time of the incident, Cates was exercising his visitation privileges as a noncustodial parent.

Heather, as plaintiff, by her mother and next friend, Nancy Cates Schmittling, filed a negligence action in the circuit court of St. Clair County against Phillip Darwin's estate and Keeley and Sons, Inc., a construction company engaged in repairing the highway area around the collision site at the time of the accident. Heather subsequently amended her complaint, naming Cates as an additional defendant and alleging that Schmittling had assigned to Heather her rights against Cates for medical expenses and other costs expended in Heather's behalf. State Farm Mutual Automobile Insurance Company, Schmittling's insurer, intervened as a subrogor against all defendants to recover uninsured motorist's benefits paid to Schmittling under her policy.

Cates filed a motion for summary judgment, alleging that the parent-child immunity doctrine precluded Heather's negligence action as well as the subrogation action. The trial court granted Cates' motion for summary judgment with respect to both actions, stating that "[i]t is difficult *** to determine that the purpose of the parental immunity doctrine would be served by applying it to the facts of this case," but that it was obliged to follow precedent.

Plaintiff appealed from that portion of the order granting summary judgment in defendant's favor on the basis of the parent-child tort immunity doctrine. The appellate court concluded that this court had not adopted the parent-child tort immunity doctrine, but the doctrine had been recognized by the appellate court in *Foley v. Foley* (1895), 61 Ill. App. 577. After examining the doctrine's history, rationale and treatment, the appellate court concluded that the doctrine should be abolished. However, the appellate court declined to fashion a rule abolishing the doctrine as concerning the general area of negligence and decided to partially abrogate in cases of automobile negligence. In doing so, the court stated that it was mindful of a number of factors, including that automobile insurance is mandatory in Illinois. (225 Ill. App. 3d 509, 517.) The appellate court thus reversed and remanded. We granted defendant's petition for leave to appeal (134 Ill. 2d R. 315). We now affirm the appellate court.

## ISSUES

We must determine whether the trial court properly granted summary judgment for defendant. The parties raise two issues: whether this court has adopted the parent-child tort immunity doctrine; and whether that doctrine bars plaintiff's action which alleged the negligent operation of an automobile.

## STANDARD OF REVIEW

No genuine issue of material fact exists; therefore, our sole function is to determine whether judgment for defendant was correct as a matter of law. See *Scottish & York International Insurance Group/Guarantee Insurance Co. v. Comet Casualty Co.* (1990), 207 Ill. App. 3d 881; *Northbrook National Insurance Co. v. Nehoc Advertising Service, Inc.* (1989), 196 Ill. App. 3d 448;

see also *Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90.

## DISCUSSION

Defendant's appeal is premised on the belief that the trial court adhered to precedent and correctly determined that the parent-child tort immunity doctrine bars plaintiff's negligence action. Defendant argues that the appellate court ignored binding authority (*Stallman v. Youngquist* (1988), 125 Ill. 2d 267; *Gerrity v. Beatty* (1978), 71 Ill. 2d 47; *Mroczynski v. McGrath* (1966), 34 Ill. 2d 451; *Nudd v. Matsoukas* (1956), 7 Ill. 2d 608) which recognizes application of the parent-child tort immunity doctrine in the area of negligence. According to defendant, the appellate court failed to realize the distinction between *obiter dictum* and *judicial dictum* when it considered these several decisions and wrongly assumed that this court had not recognized the parent-child tort immunity doctrine in the area of negligence. Defendant thus maintains that the appellate decision abrogating the doctrine in automobile negligence cases violates the rule of *stare decisis* and should be reversed.

Plaintiff counters that the appellate court could partially abrogate the doctrine in automobile negligence cases because the question of whether parent-child tort immunity bars parent-child negligence actions has never been decided by this court. Plaintiff acknowledges that this court has discussed the doctrine in the cases cited by defendant, but disputes those discussions' precedential effect. According to plaintiff, this court has only tangentially discussed application of the parent-child tort immunity doctrine in the area of negligence in determining other issues.

To evaluate the precedential effect of this court's pronouncements concerning the parent-child tort immunity

doctrine, we must preliminarily examine general rules governing judicial statements.

The term *"dictum"* is generally used as an abbreviation of *obiter dictum,* which means a remark or opinion uttered by the way. Such an expression or opinion as a general rule is not binding as authority or precedent within the *stare decisis* rule. (*Board of Trustees of the Police Pension Fund v. Illinois Human Rights Comm'n* (1986), 141 Ill. App. 3d 447, 456; 21 C.J.S. *Courts* §142 (1990).) On the other hand, an expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum,* is a judicial *dictum.* (See *Scovill Manufacturing Co. v. Cassidy* (1916), 275 Ill. 462, 470; *Rhoads v. Chicago & Alton R.R. Co.* (1907), 227 Ill. 328, 337; *Law v. Grommes* (1895), 158 Ill. 492, 494; see also 21 C.J.S. *Courts* §142 (1990) (such *dictum* should be considered a judicial *dictum* as distinguished from a mere *obiter dictum*).) And further, a judicial *dictum* is entitled to much weight, and should be followed unless found to be erroneous. (21 C.J.S. *Courts* §142 (1990); see *Law,* 158 Ill. 492; *Rhoads,* 227 Ill. 328 (where expression of opinion considered to be judicial *dictum* held to have force of judicial determination).) Even *obiter dictum* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court. See 21 C.J.S. *Courts* §142 (1990).

Additionally, the rule of *stare decisis* cannot be extended to implications from what was decided in a former case. However, that effect must be given to the implications contained in the decision of a higher court and that the premises implicit in a holding are as authoritative as the holding itself. 21 C.J.S. *Courts* §139(b) (1990).

The appellate court in the instant case relied on *Nix v. Smith* (1965), 32 Ill. 2d 465, 470, which states that a "judicial opinion is a response to the issues before the court, and these opinions, like others, must be read in the light of the issues that were before the court for determination." (*Cf. People v. Palmer* (1984), 104 Ill. 2d 340 (precedential scope of decision limited to facts before court).) The *Nix* court accordingly distinguished the authority cited by the plaintiff because the issues before the court in those decisions did not relate to the issue before the *Nix* court.

We believe that the rule and its application in *Nix* are not necessarily at odds with the previously mentioned rules concerning judicial *dicta*. Our preliminary inquiry remains the same in either case. To what extent was the issue of parent-child tort immunity previously *before this court* so that *dictum* on that point would be considered judicial *dictum* and thus have the force of a judicial determination? Accordingly, we must examine the authority cited by defendant within the context in which it arose.

The parent-child tort immunity doctrine first appeared in American case law in *Hewlett v. George* (1891), 68 Miss. 703, 9 So. 885, which held that parents are immune from tort actions brought by their unemancipated minor children. Our appellate court quickly adopted the doctrine in *Foley v. Foley* (1895), 61 Ill. App. 577, 580. According to defendant, this court first recognized the parent-child tort immunity doctrine 61 years later in *Nudd*, 7 Ill. 2d 608. Plaintiff argues that *Nudd* did not hold that the parent-child tort immunity doctrine barred negligence actions because the court did not decide that issue.

*Nudd* involved a tort action by a child against his father, which alleged the willful and wanton operation of an automobile. The *Nudd* court granted leave to appeal to "re-examin[e]" the "rule of parental immunity" as an-

nounced in *Meece v. Holland Furnace Co.* (1933), 269 Ill. App. 164 (parent-child tort immunity doctrine prevented child's action against father's employer, brought under a theory of *respondeat superior* and alleging father's negligence). (*Nudd*, 7 Ill. 2d at 611.) The *Nudd* court characterized the issue as whether a minor could sue his father for willful and wanton misconduct. Relying on *Foley* and *Meece*, defendant argued that the common law and public policy prohibited a child's tort action against his parent. After noting that Illinois had adopted the *Hewlett* "rule of parental immunity from tort liability" in *Foley*, that *Meece* restated the doctrine, that other jurisdictions had likewise held, but that the rule's logic had been convincingly attacked in several cases, the court noted that several foreign jurisdictions had approved tort actions against parents. *Nudd* then distinguished the defendant's cited authority as not being determinative of parental tort immunity in the context of willful and wanton misconduct. Referring to the public policy underlying the doctrine with respect to negligent conduct, the court stated:

> "*While this policy might be such justification to prevent suits for mere negligence within the scope of the parental relationship* we do not conceive that public policy should prevent a minor from obtaining redress for wilful and wanton misconduct on the part of a parent." (Emphasis added.) (*Nudd*, 7 Ill. 2d at 619.)

The court continued:

> "We do not feel that *the announcement of this doctrine* should be left to the legislature. The *doctrine of parental immunity*, as far as it goes, was created by the courts. It is especially for them *to interpret and modify that doctrine* to correspond with prevalent considerations of public policy and social needs." (Emphasis added.) (*Nudd*, 7 Ill. 2d at 619.)

The *Nudd* court thereby concluded that the parent-child tort immunity doctrine did not bar the child's action against his father for willful and wanton misconduct in the operation of a vehicle.

Clearly, the doctrine of parent-child tort immunity, its history and underlying policies were argued in *Nudd*. The issue before the court was whether the doctrine should apply in a case where willful and wanton misconduct was alleged. We believe *Nudd* recognized the doctrine by way of judicial *dictum*, having the force of a judicial determination, and then "modif[ied]" the doctrine based on the policies presented by the case before it. (*Nudd*, 7 Ill. 2d at 619.) The precatory language used by the court in referring to the policy underlying the doctrine's application in negligence cases merely demonstrates a reservation of judgment concerning the strength of policy in the area of negligence. Certainly if a court expresses the view that its job is to interpret and modify a doctrine which it has recognized by way of judicial *dictum* and the court then does so, that doctrine has been accepted by the court. This court was certainly also aware, in recognizing the doctrine, that the doctrine traditionally precluded tort actions sounding in negligence. (See *Nudd*, 7 Ill. 2d at 611, 616-17, citing *Meece*, 269 Ill. App. 164.) Although *Nudd* decided the question of parent-child tort immunity in the area of intentional torts, judicial *dictum* recognized the doctrine's existence in the area of negligence and that recognition carried the full force of a judicial determination.

The recognition of parent-child tort immunity doctrine is further apparent by its reference in subsequent decisions of this court. (*Mroczynski v. McGrath* (1966), 34 Ill. 2d 451, 454-55 (*obiter dictum* referring to underlying policy of family harmony and stating that parental immunity doctrine was "review[ed]" in *Nudd*); *Koby-*

*lanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165 (relying on *Mroczynski* and *Nudd* to hold that teachers standing *in loco parentis* under the School Code are immunized to same extent as parents); *Tanari v. School Directors* (1977), 69 Ill. 2d 630, 636 (citing *Nudd* and stating, "parent is not liable for injuries to his child absent wilful and wanton misconduct"); *Gerrity v. Beatty* (1978), 71 Ill. 2d 47 (citing *Kobylanski, Mroczynski* and *Nudd* and stating that, based on public policies, general rule in State prevented children from suing parents for mere negligence); *Thomas v. Chicago Board of Education* (1979), 77 Ill. 2d 165 (citing *Nudd* and *Mroczynski* for rule that children may not maintain actions for negligence against their parents); *Cockrum v. Baumgartner* (1983), 95 Ill. 2d 193 (*obiter dictum* citing *Thomas* and recognizing rule that children may not sue parents for negligence).) Through frequent repetition and approval, the rule has become established.

We note that the dissent in *Kobylanski* disputed the majority's statements that the rule represented well-settled law. (*Kobylanski*, 63 Ill. 2d at 178-79 (Goldenhersh, J., dissenting, joined by Ward and Schaefer, JJ.).) Similarly, in *Tanari*, Justice Goldenhersh specially concurred, urging that the rule, if it existed, should be supported by authority other than *Nudd*. (*Tanari*, 69 Ill. 2d at 639-40 (Goldenhersh, J., specially concurring).) We agree with defendant that these statements support rather than dispel the view that the rule was developing into settled law; these several views, after all, did not represent the majority's viewpoint. *Cf.* 21 C.J.S. *Courts* §142 (1990) (*dicta*, through frequent repetition and approval, may have same or substantially same strength and importance attached to precedents).

*Stallman v. Youngquist* (1988), 125 Ill. 2d 267, represents an instance where the application of the parent-child tort immunity doctrine in an automobile negligence

case was before this court. (See also *Stallman v. Young-quist* (1984), 129 Ill. App. 3d 859, *on remand* (1987), 152 Ill. App. 3d 683.) Although "it [was] unnecessary" for the court "to reach the issue concerning the status of the parental immunity doctrine" (*Stallman*, 125 Ill. 2d at 269), the court vacated the appellate judgment to the extent that the ruling purported to effect a change in the status of the doctrine. The *Stallman* court's statement expressing that the appellate judgment was vacated was not merely a judicial *dictum*, as implied by defendant, it was a ruling which invalidated the appellate judgment. That ruling is consistent with this court's previous statements recognizing the parent-child tort immunity doctrine in the area of negligence.

In sum, while this court has not rendered a decision holding that the parent-child tort immunity doctrine bars negligence actions, its recognition of the doctrine in this area of the common law and subsequent confirmations of that recognition have precedential effect. The appellate court misperceived the effect of those several pronouncements. We do not, however, reverse its decision. We must yet consider whether the parent-child tort immunity doctrine bars plaintiff's automobile negligence action.

Defendant argues that the parent-child tort immunity doctrine is long-standing in Illinois and recognized as applying in negligence cases by all appellate court districts. Defendant claims that the appellate decision below abolished the immunity doctrine *in toto*. Assuming that perspective, defendant argues that: (1) preservation of the parent-child relationship is recognized in Illinois as a worthy public policy goal; (2) the immunity's purpose is to protect parent and child from an opportunity to engage in fraud and collusion; (3) the elimination of the immunity will threaten parents' authority to discipline and control their children; (4) abrogation of the immunity

would allow courts to second-guess the exercise of parental discretion in day-to-day family matters; (5) the doctrine as it stands applies to custodial and noncustodial parents; and (6) the immunity should be applied irrespective of the existence of liability insurance.

Plaintiff responds that the originally recognized policy bases for the immunity, the preservation of family harmony and prevention of collusion and fraud, do not sufficiently justify its application in automobile negligence cases. Plaintiff contends that an automobile negligence action brought by a very young child against her father does not disrupt family harmony where divorce has already occurred. Plaintiff further contends that it is the injury itself, and not the subsequent legal action to remedy those damages, which disrupts family harmony. Moreover, according to plaintiff, any possibility of collusion and fraud in such cases is easily overcome by resort to discovery, cross-examination, review of evidence and a heightened degree of skepticism. Plaintiff also argues that in this case fraud and collusion are virtually impossible because the extent of Heather's injuries is independently ascertainable.

Preliminarily, we recognize that there is good reason for defendant to argue his appeal as if the appellate decision below abolished the immunity in all areas of parent-child negligence law. Although the facts of this appeal concern automobile negligence and plaintiff characterizes the issue as whether the immunity applies to automobile negligence cases, we understand that the entire area of parent-child negligence is necessarily implicated. The entire area of parent-child negligence is necessarily implicated because there is no fundamental distinction between automobile negligence situations and other negligence scenarios (parent riding child on bicycle, parent riding child on lawnmower, parent pushing child in backyard swing). This fact is acknowledged both ex-

pressly and implicitly in jurisdictions which have confronted the issue of parent-child tort immunity. (Compare *Streenz v. Streenz* (1970), 106 Ariz. 86, 89-90, 471 P.2d 282, 286 (McFarland, J., dissenting) ("Although this is an automobile negligence case, the striking down of the immunity doctrine is not limited to this field. The implications in the majority opinion make it plain that the area they have opened is analogous to Gertrude Stein's famous Rose; a tort is a tort is a tort. If the immunity from suit is removed for an automobile tort, it follows logically that it is removed for all negligent acts—for example, those which may occur in the sanctity of the home"); *Nocktonick v. Nocktonick* (1980), 227 Kan. 758, 770, 611 P.2d 135, 143 (Schroeder, J., dissenting) (same); with *Turner v. Turner* (Iowa 1981), 304 N.W.2d 786 (abrogation of immunity doctrine in the general area of negligence, although case merely concerned automobile accident); *Rigdon v. Rigdon* (Ky. 1970), 465 S.W.2d 921 (same).) The difficulty in discriminating between parent-child automobile negligence and all other forms of negligence is also revealed by those decisions which limit the scope of their holdings to automobile negligence. Almost without exception, these cases rely on the existence of liability insurance to do so. (See Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification*, 50 Fordham L. Rev. 489, 511 (1982); Beal, *"Can I Sue Mommy?" An Analysis of a Woman's Tort Liability for Prenatal Injuries to Her Child Born Alive*, 21 San Diego L. Rev. 325, 339 (1984); see also *Nocktonick v. Nocktonick* (1980), 227 Kan. 758, 611 P.2d 135; *Hebel v. Hebel* (Alaska 1967), 435 P.2d 8.) We do not, however, consider such a basis a sound reason to impose liability. (*Schenk v. Schenk* (1968), 100 Ill. App. 2d 199, 205.) Having expressed this significant caveat, we approach the question of whether the parent-child tort immunity

doctrine bars plaintiff's action which alleged the negligent operation of an automobile.

The parent-child tort immunity doctrine was unknown at English common law and arose in American case law as the result of three decisions, often termed "the great trilogy" (*Hewlett*, 68 Miss. 703, 9 So. 885 (married, minor child barred from suing mother for malicious imprisonment in insane asylum); *McKelvey v. McKelvey* (1903), 111 Tenn. 388, 77 S.W. 664 (minor child barred from suing parent for cruel and inhumane punishment); *Roller v. Roller* (1905), 37 Wash. 242, 79 P. 788 (minor child barred from suing father for rape)). (See Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification*, 50 Fordham L. Rev. 489, 495 (1982).) These cases articulated several public policies to justify the immunity: preservation of family harmony, preservation of parental authority to control children by way of analogy to spousal immunity, and the avoidance of a depletion of family assets to the detriment of the injured child's siblings (commonly referred to as the "family exchequer" rationale) (*Dunlap v. Dunlap* (1930), 84 N.H. 352, 361, 150 A. 905, 909). Because most of the justifications for the immunity concerned the relationship of a parent to a minor child under his custody and control and for whose support he was responsible, the immunity did not generally apply to an adult child or emancipated minor children. Restatement (Second) of Torts §895G, Comment *d*, at 428 (1979).

Despite the development of the immunity against parent-child tort litigation, both English and American common law has always allowed contract and property actions between parent and child. (See McCurdy, *Torts Between Persons in Domestic Relation*, 43 Harv. L. Rev. 1030, 1057 (1930); Barder & Ingram, *The Decline of The Doctrine of Parent-Child Tort Immunity*, 68 Ill. B.J. 596 (1980); 50 Fordham L. Rev. at 497, 499.) Other nine-

teenth century authority indicates that prior to the immunity, children were allowed to sue their parents for both negligent and intentional torts. (See McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030 (1930); W. Keeton, Prosser & Keeton on Torts §122, at 904-07 (5th ed. 1984).) What *Hewlett* "really did was to establish a new rule of exceptional character rather than enforce a rule already established." (*Dunlap,* 84 N.H. at 358, 150 A. at 908 (citing case).) Nonetheless, the majority of States quickly adopted the doctrine. *Foley* was decided in Illinois shortly after *Hewlett.* Without citing authority, *Foley* based its holding that a minor child could not sue his parent for mistreatment on a reluctance to interfere with a parent's right to "govern" his child. *Foley,* 61 Ill. App. at 579.

With such extreme cases as its basis, legal criticism of the parent-child tort immunity doctrine inevitably followed. (*Dunlap,* 84 N.H. 352, 150 A. 905; 43 Harv. L. Rev. 1030; see Annot., 6 A.L.R.4th 1066 (1981).) The majority of legal scholars who have discussed the immunity doctrine sharply criticize it and suggest a variety of modifications. See W. Keeton, Prosser & Keeton on Torts §122 (5th ed. 1984); Pipino, *In Whose Best Interest? Exploring the Continuing Viability of the Parental Immunity Doctrine,* 53 Ohio St. L.J. 1111 (1992); Hollister, *Parent-Child Immunity: A Doctrine in Search of Justification,* 50 Fordham L. Rev. 489 (1982); Grobart, *Parent-Child Tort Immunity in Illinois,* 17 Loy. U. Chi. L.J. 303 (1986); McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030 (1930).

Concerning the general area of negligence, the various jurisdictions have basically followed one of two broad approaches in defining the scope of the immunity. The various jurisdictions have either: (1) fully abrogated the doctrine concerning all types of parent-child negligence and applied a standard which limits actionable liability

between parent-child; or (2) partially abrogated the doctrine with respect to all types of parent-child negligence by carving out exceptions to its reach. The practical effect of either of these two broad approaches is often no different. See Annot., 6 A.L.R.4th 1066, 1078 n.49 (1981).

A sizeable number of jurisdictions (approximately 25) have fully abrogated the doctrine and applied a standard limiting parent-child liability by relying on either *Gollar v. White* (1963), 20 Wis. 2d 402, 122 N.W.2d 193 (*Gollar* standard), or *Gibson v. Gibson* (1971), 3 Cal. 3d 914, 479 P.2d 648, 92 Cal. Rptr. 288 (reasonable parent standard). (See McLeod, *Jilani v. Jilani: The Erosion Of The Parental Tort Immunity Doctrine In Texas*, 28 Hous. L. Rev. 717, 718 n.8 (1991); Pipino, *In Whose Best Interest? Exploring the Continuing Viability of the Parental Immunity Doctrine*, 53 Ohio St. L.J. 1111, 1119 (1992); see also Annot., 6 A.L.R.4th 1066, 1078 (1981).) New York courts, on the other hand, follow *Holodook v. Spencer* (1974), 36 N.Y.2d 35, 324 N.E.2d 338, 364 N.Y.S.2d 859 (New York standard). See *The "Reasonable Parent" Standard: An Alternative to Parent-Child Tort Immunity*, 47 U. Colo. L. Rev. 795 (1976); 53 Ohio St. L.J. at 1119, 1120 (1992).

Under the *Gollar* standard, a child may sue his parent for negligent conduct except where the conduct involves "an exercise of parental authority *** [or] an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care." (*Gollar*, 20 Wis. 2d at 413, 122 N.W.2d at 198.) The first limitation embraces the area of parental discipline; and the second has been interpreted as concerning only the performance of legal duties and not moral duties, such as a duty to supervise. (*Thoreson v. Milwaukee & Suburban Transport Co.* (1972), 56 Wis. 2d 231, 246-47, 201 N.W. 745, 753.) Ar-

guably, under the *Gollar* standard, a child could not sue his parent for a failure to maintain the family residence in some manner (for instance, a failure to secure carpeting).

In California, courts apply a reasonable parent standard to test the viability of all negligence actions between parent and child. (*Gibson*, 3 Cal. 3d at 922, 479 P.2d at 653, 92 Cal. Rptr. at 293 ("what would an ordinarily reasonable and prudent parent have done in similar circumstances?").) And in New York, a child may sue his parent for negligent conduct except that a parent's failure to supervise the child is not recognized as an actionable tort; there exists no legal duty on the part of parents to supervise their children. *Holodook*, 36 N.Y.2d at 50-51, 324 N.E.2d at 346, 364 N.Y.S.2d at 871.

States which apply a form of the *Gollar* standard include Texas (*Felderhoff v. Felderhoff* (Tex. 1971), 473 S.W.2d 928, 933; *Jilani v. Jilani* (1988), 32 Tex. Sup. Ct. J. 136, 767 S.W.2d 671 (immunity allowed where alleged acts involve a reasonable exercise of parental authority or the exercise of ordinary parental discretion with respect to provisions for care and necessities of child)), Michigan (*Plumley v. Klein* (1972), 388 Mich. 1, 8, 199 N.W.2d 169, 172-73 (immunity abrogated except where parent exercising reasonable parental authority or discretion)), Kentucky (*Rigdon v. Rigdon* (Ky. 1971), 465 S.W.2d 921, 923 (same as *Gollar* except no enumeration of parental duties)), and Arizona (*Streenz v. Streenz* (1970), 106 Ariz. 86, 89, 471 P.2d 282, 285 (" 'role of *paterfamilias* should not be usurped by the judiciary as to intrafamilial activities involving parental discipline, care and control' ")).

In contrast, Illinois stands in that group of jurisdictions, a minority, which have partially abrogated the doctrine by carving out exceptions to it. The approach taken by Illinois and this group of jurisdictions, however, is

considered problematic, as the law which develops is often inconsistent and arbitrary. (See *Cummings v. Jackson* (1978), 57 Ill. App. 3d 68, 73 (Webber, J., dissenting) ("Either the doctrine of parental immunity should be abolished altogether or left standing intact. The piecemeal approach, taken in this case and in *Schenk*, can lead to nothing but confusion").) As a result, there exists in Illinois no comprehensive framework regarding the scope of the immunity. See 47 U. Colo. L. Rev. at 803-04 (comparing alternative approaches to parent-child tort immunity).

Illinois courts have relied consistently on three major public policy considerations for the parent-child tort immunity doctrine: (1) the preservation of family harmony, (2) the discouragement of fraud and collusion, and (3) the preservation of parental authority and discipline. (See Ross, *The Parental Tort Immunity Doctrine Applied to Wrongful Death Actions: A Rule Without Reason. Chamness v. Fairtrace, 158 Ill. App. 3d 325, 511 N.E.2d 839 (5th Dist. 1987)*, 13 So. Ill. U. L.J. 175, 177-78 (1988).) Illinois courts have more consistently espoused the preservation of family harmony rationale. See McArdle, *Stallman v. Youngquist: Parent-Child Tort Immunity: Will Illinois Ever Give This Doctrine the Examination and Analysis it Deserves?*, 19 J. Marshall L. Rev. 807, 814-15 (1986); *Nudd*, 7 Ill. 2d at 619 ("only" policy which might justify doctrine in area of negligence is "reluctance to create litigation and strife between members of the family unit"); *Illinois National Bank & Trust Co.* (1980), 83 Ill. App. 3d 234, 238 (doctrine should not be abolished *in toto* because of contemporary need for family harmony); *Wilkosz v. Wilkosz* (1984), 124 Ill. App. 3d 904, 909 (same); see also *Gerrity v. Beatty* (1978), 71 Ill. 2d 47, 49.

Yet, Illinois courts have narrowed the doctrine, by creating exceptions to it, where the doctrine's public pol-

icy purposes do not appear to be served. In *Nudd*, this court "modif[ied]" the immunity doctrine by recognizing an exception in an automobile accident case where willful and wanton misconduct was alleged. (*Nudd*, 7 Ill. 2d at 619.) *Nudd* implicitly viewed the defendant father's conduct, speeding on wet pavement and running a red light, as beyond "the scope of the parental relationship." (*Nudd*, 7 Ill. 2d at 619.) *Nudd* considered that the "only" policy justifying parental immunity, a reluctance to create litigation and family strife, was not served by upholding the immunity where the conduct was of that nature. (*Nudd*, 7 Ill. 2d at 619.) *Nudd* reasoned that barring a suit for conduct which was not parental in nature did not foster family harmony, but only deprived the child of redress for his injuries. *Nudd* accordingly allowed intrafamily litigation. Following *Nudd*, however, the parent-child tort immunity doctrine remained as a bar to negligence actions.

Illinois courts, however, have carved out additional exceptions to the immunity in the area of negligence. An exception to the immunity rule is now recognized where a child sues a deceased parent. (*Johnson v. Myers* (1972), 2 Ill. App. 3d 844 (when the family relationship is dissolved by death, the policy basis for the immunity doctrine ceases to exist as well); but see *Marsh v. McNeill* (1985), 136 Ill. App. 3d 616, 622 (parent-child tort immunity barred wrongful death action by representative of deceased parents' estates against living daughter tortfeasor); see also *Edgington v. Edgington* (1990), 193 Ill. App. 3d 104.) Another exception allows children to sue grandparents. *Gulledge v. Gulledge* (1977), 51 Ill. App. 3d 972 (rationale behind immunity loses persuasive force when family relations more distant than parent-child are involved); see also *Busillo v. Hetzel* (1978), 58 Ill. App. 3d 682.

Illinois courts also reject application of the parent-child tort immunity doctrine as a bar to third-party contribution actions against allegedly negligent parents. (*Hartigan v. Beery* (1984), 128 Ill. App. 3d 195; *Moon v. Thompson* (1984), 127 Ill. App. 3d 657; *Larson v. Buschkamp* (1982), 105 Ill. App. 3d 965.) The *Larson* court reasoned that (1) several Illinois decisions had restricted application of the doctrine, (2) the child's injury rather than the suit disrupted the family, and (3) the prevalence of liability insurance mitigated against the possibility of domestic disharmony. *Larson* allowed a third-party contribution action against a parent despite the argument that the parent might defend himself by asserting the child's negligence or discrediting his injuries. In *Hartigan*, a third-party contribution action was allowed against a parent even though the action was based on negligent supervision of the child, a realm of conduct clearly within the "scope of the parental relationship." (*Nudd*, 7 Ill. 2d at 619; *Schenk v. Schenk* (1968), 100 Ill. App. 2d 199, 203.) *Hartigan* reasoned that the right of contribution prevailed over application of the immunity as a bar to actions by parties outside the family.

Another exception allows a parent-child negligence action where the alleged duty is owed to the general public. (See *Cummings v. Jackson* (1978), 57 Ill. App. 3d 68 (breach of duty owed to general public is not as disruptive of family unity as breach of duty owed to family members).) This exception is in keeping with *Nudd*'s view that the immunity is insupportable as applied to conduct outside the parent-child relationship. It also suggests confinement of the immunity to actions based on conduct constituting a breach of parental or family duties. *Cummings*, however, relies on *Schenk v. Schenk* (1968), 100 Ill. App. 2d 199, which created a more significant exception to the parent-child tort immunity doctrine.

The *Schenk* exception is significant because, as legal commentators as well as other courts have recognized, it is similar conceptually to the *Gollar* standard and also susceptible to being interpreted as fully abrogating the immunity rule. (See Hollister, *Parent-Child Immunity: A Doctrine In Search of Justification*, 50 Fordham L. Rev. 489, 512 n.151 (1982), quoting *Illinois National Bank & Trust Co. v. Turner* (1980), 83 Ill. App. 3d 234, 236 (appellate court of Illinois appears to have adopted approach similar to *Gollar* and abrogated the immunity *except* for injuries caused by " 'mere negligence within the scope of the parental relationship' "); *Pedigo v. Rowley* (1980), 101 Idaho 201, 204, 610 P.2d 560, 563 (citing *Schenk* and stating "Illinois has also limited the application of the doctrine of parental immunity, but rather than enumerating the exceptions as Wisconsin did in *Gollar v. White*, *** Illinois looks to whether the conduct arises out of the family relationship and is directly connected with family purposes"); *Gibson v. Gibson* (1971), 3 Cal. 3d 914, 922, 479 P.2d 648, 653, 92 Cal. Rptr. 288, 293 (classifying *Schenk* among decisions which have fully abrogated the immunity and "allow children to sue their parents in tort").) With *Schenk*, also, Illinois became somewhat unique among the various jurisdictions in permitting a parent-child automobile negligence action without relying on the existence of liability insurance as the underlying rationale. (See 21 San Diego L. Rev. at 338-39.) For these reasons, the rationale of *Schenk* bears close examination.

*Schenk* concerned the dismissal of a father's automobile negligence complaint against his daughter for the failure to state a cause of action. The complaint alleged that the daughter had negligently operated her auto and run her vehicle into her father as he walked on the street. *Schenk* looked to *Nudd*'s concept of conduct as falling either within or beyond the " 'scope of the paren-

tal relationship.' " (*Schenk*, 100 Ill. App. 2d at 203.) *Schenk* then characterized that conduct within the parental relationship which remained immunized after *Nudd* as being either the performance of a duty arising out of the family relationship or activities for the objectives or purposes of the family. Looking to the various historical exceptions, including the intentional tort exception recognized in *Nudd*, *Schenk* concluded that the traditional family harmony rationale no longer supported the immunity rule. (See *Schenk*, 100 Ill. App. 2d at 204-05.) The court, nonetheless, found that there was no reason to eliminate the immunity for conduct "arising out of the family relationship and directly connected with the family purposes and objectives," where the negligence was merely the product of intrafamily living. (*Schenk*, 100 Ill. App. 2d at 206.) The court finally concluded that the father's complaint stated a cause of action because it contained no allegation that his daughter's conduct was related to a family purpose and the duty alleged was owed to the general public. In doing so, *Schenk* rejected the argument that the action should be allowed because of the existence of insurance.

Unfortunately, however, in referring to two examples of the type of parent-child negligence which should remain immunized, *Schenk* referred to *Nudd* and *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, which both concerned alleged violations of narrower parental duties (denial of care, affection, guidance, financial aid, a pleasant home, etc.) than those conceivably broad duties connected with a "family purpose." *Schenk* did attempt some clarification of the immunized "family purpose" sphere by stating that the doctrine was necessary to keep courts from becoming responsible for "supervision over every day family conduct of parent and child" and to prevent litigation "over what is or is not ordinary negligence in the operation of a household." (*Schenk*, 100 Ill. App. 2d at

206.) Because of its expansive language and the examples cited, however, *Schenk* was unclear about which aspects of the parent-child relationship, beyond automobile negligence, remained protected by the immunity. Arguably, however, *Schenk* attempted to articulate a standard pertaining to negligence in general which approximates the *Gollar* standard, in terms of a rationale.

Nonetheless, it is clear that *Schenk* intended to permit parent-child automobile negligence actions even beyond the preliminary pleading stage. Referring to the parent's and child's individual rights to be on the street, the court stated, "It seems thus clear to us that reason and justice require that the immunity rule should not. stand as an insuperable bar to redress for injuries occasioned by the exercise of those rights." (*Schenk*, 100 Ill. App. 2d at 206; see also *Nocktonick v. Nocktonick* (1980), 227 Kan. 758, 767, 611 P.2d 135, 141 (citing *Schenk* as abolishing parental immunity in automobile negligence cases).) Notably, the Delaware Supreme Court impliedly adopted *Schenk*'s reasoning concerning the demise of family harmony, but it more clearly articulated a standard as applied to negligence in general. See *Schneider v. Coe* (Del. 1979), 405 A.2d 682 (driving in auto not unique to the parent-child relationship and does not bring into question the validity of State supervision of parental control, authority and discretion in supervising a child); Beal, *"Can I Sue Mommy?" An Analysis of A Woman's Tort Liability for Prenatal Injuries to Her Child Born Alive*, 21 San Diego L. Rev. 325, 338-43 (1984).

Unfortunately, many Illinois appellate decisions after *Schenk* looked to its expansive "family purpose" language and not to the underlying rationale. Thus, children were prevented from suing their parents for the negligent operation of an auto because parent and child were en route to a piano lesson (*Hogan v. Hogan* (1982), 106

Ill. App. 3d 104); because they were going to visit a prospective college (*Eisele v. Tenuta* (1980), 83 Ill. App. 3d 799); because they were going to pick up another child (*Wilkosz v. Wilkosz* (1984), 124 Ill. App. 3d 904); and, in the instant case, because the father was exercising his noncustodial parental visitation rights (225 Ill. App. 3d 509). See also *Illinois National Bank & Trust Co. v. Turner* (1980), 83 Ill. App. 3d 234 (disagreeing with *Schenk* and *Cummings* that the absence of facts in complaint showing a family purpose results in no immunity and holding that there must be an affirmative allegation of no family purpose); *Setinc v. Masny* (1989), 185 Ill. App. 3d 15, 19 (no family purpose exception to immunity because negligent storing of fuel in garage is a necessary "adjunct" to family activity of flying model airplanes).

Other appellate decisions imply that *Schenk* distinguished between automobile negligence and other forms of negligence, but fail to articulate the reason for the distinction. See *Cosmopolitan National Bank v. Heap* (1970), 128 Ill. App. 2d 165 (holding that immunity barred a child's action against his father for failure to maintain household premises by permitting loose stairway carpeting); *Ackley v. Ackley* (1988), 165 Ill. App. 3d 231 (holding that immunity barred child's actions against father for violation of housing ordinance by not providing stairway handrails).

We have considered the reasoning of *Schenk* as well as *Cummings* and approve of those exceptions. A public policy based on the principle of preserving family harmony necessarily argues against every kind of intrafamily litigation. The allowance of a variety of intrafamily negligence actions by exception reveals that the family harmony rationale, an apparently absolute principle, is in fact balanced against other considerations or is not, as a practical matter, a viable consideration. (*Cf.* 50 Fordham L. Rev. 489.) In truth, the traditional policy of family

harmony is no longer viable, as *Schenk* recognized. The focus has shifted to a concern with preventing litigation concerning conduct intimately associated with the parent-child relationship. The exceptions consistently demonstrate that where the family relationship is dissolved or where that relationship has ceased to exist with respect to conduct giving rise to the injury, the immunity will not be applied. This is so because the immunity exists only to further the parent-child relationship, and where that relationship is not impacted, the policies supporting the doctrine lose their persuasive strength. (See *The "Reasonable Parent" Standard: An Alternative to Parent-Child Tort Immunity*, 47 U. Colo. L. Rev. 795, 804 (1976).) The exceptions themselves thereby tend to highlight the arbitrariness of the traditional underlying public policies. See 50 Fordham L. Rev. 489.

Both the traditional family harmony and collusion rationales are accordingly diminished. If negligence actions between parent and child are maintainable where the alleged duty is owed to the general public or where the conduct is beyond the parental relationship, these policies offer little support.

We note, parenthetically, in considering how the various exceptions to the doctrine reveal the erosion of the traditional family harmony and anticollusion rationales, that the doctrine has yet been extended in one area. This court has interpreted sections 24—24 and 34—84a of the School Code as effectively extending parent-child immunity for negligence to teachers standing *in loco parentis* under the Code. (Ill. Rev. Stat. 1967, ch. 122, pars. 24—24, 34—84a.) (*Kobylanski*, 63 Ill. 2d 165 (tort liability of teacher standing *in loco parentis* no greater than that of parent so that teacher's liability limited to willful and wanton conduct); see also *Gerrity*, 71 Ill. 2d 47; *Thomas*, 77 Ill. 2d 165; *Tanari*, 69 Ill. 2d 630.) However, in allowing teachers the parent-child immunity de-

fense because the School Code granted them *in loco parentis* status, this court did not reexamine the public policies underlying the parent-child tort immunity doctrine, nor the scope of the immunity as applied to negligence cases between parent and child. Notably, also the parameters of the tort immunity as applied to teachers are fully congruent with their statutorily defined status *in loco parentis*. Thus, a teacher is allowed the protection of the immunity only to the extent that he acts within the confines of his duties *in loco parentis*. See *Gerrity*, 71 Ill. 2d at 51 (immunity protects teacher's disciplinary and supervisory authority).

The notion that parent-child tort immunity promotes family harmony in the area of negligence, the justification most relied on, has now been largely discounted. Without exception, legal scholars recognize that, more often than not, it is the injury, if anything, which disrupts the family. (See 17 Loy. U. Chi. L.J. at 307; Rooney & Rooney, *Parental Tort Immunity: Spare the Liability, Spoil the Parent*, 25 New Eng. L. Rev. 1161, 1165 (1991).) Providing a child an avenue to obtain redress of those injuries does not work against family harmony. Even in the small percentage of cases where a parent or child has no liability insurance and injuries are serious, or in the case where an older child would perhaps bring an action to challenge the parent's authority, the suit cannot disrupt harmony which, apparently, does not exist; the law does not have that capacity. The *Schenk* and *Cummings* exceptions evidence this reality.

The impact of liability insurance on the traditional rationales for the immunity cannot be ignored. It is now generally recognized that the existence of liability insurance eliminates the actual adversity of parent and child in negligence actions. (See 17 Loy. U. Chi. L.J. at 307; *Nocktonick v. Nocktonick* (1980), 227 Kan. 758, 769, 611 P.2d 135, 142; *Sorensen v. Sorensen* (1975), 369 Mass.

350, 364, 339 N.E.2d 907, 915.) Where liability insurance is present, the parent and child are only nominally adverse; the "real" defendant is the insurer. Further, negligence actions between parent and child are rarely brought, except in cases where insurance is present. This is not to say that liability should be allowed simply because liability insurance exists. We agree with defendant in that respect. Liability should be allowed where the reasons for its preclusion do not exist for whatever reason. The fact that liability insurance significantly undercuts a traditional basis for the rule is a reality, however, which must be considered by courts.

Also, when the effects of insurance are considered, the *Nudd* decision becomes susceptible to additional interterpretation. Arguably, the policy underlying the immunity was not served in *Nudd*, not because disharmony already existed in the family, the conduct was not in fact that egregious, but because it was apparent to the court that father and child were not adverse regarding the tortious conduct or institution of the suit. Although the *Nudd* court did not reach plaintiff's arguments concerning the presence of liability insurance and the fact that the parent permitted the suit, the existence of those realities is not to be overlooked. Clearly, the child and father were only nominally adverse, as in the case of automobile negligence cases involving insurance.

The widespread existence of insurance and the resulting diminished adversity of parties impacts on the traditional policies against collusion and fraud. Defendant argues that the parent-child relationship is threatened by presenting it with an opportunity to collude and defraud. Numerous authorities have pointed out that even in cases where collusion and fraud may exist, our adversarial legal system, through its skilled attorneys, discovery, examinations and evidentiary reviews, is adequately equipped to deal with such problems and does so daily in

other intrafamily litigations and areas of law. We believe this to be generally true. The stronger argument against this rationale is that it forms an insufficient basis to deny redress to a whole class of litigants. (See, *e.g., Lee v. Comer* (1976), 159 W. Va. 585, 593, 224 S.E.2d 721, 725; 50 Fordham L. Rev. at 501.) A rule which seeks to incidentally attack fraud by withholding legal protection for all claimants, regardless of the justice of their claims, "employs a medieval technique which, however satisfying it may be to defendants, \*\*\* is scarcely in keeping with the acknowledged function of a modern legal system." Leflar & Sanders, *Mental Suffering and its Consequence—Arkansas Law*, 7 U. Ark. L. Sch. Bull. 43, 60 (1939).

The fact that our legislature has abolished the husband-wife tort immunity doctrine also demonstrates a reluctance to adhere to both the traditionally espoused bases for intrafamily immunities. (See Pub. Act 85—625, eff. January 1, 1988 (amending Ill. Rev. Stat. 1987, ch. 40, par. 1001).) Although the two doctrines are fundamentally different, spousal immunity being based on the legal unity of husband and wife, each doctrine has been typically supported by the same public policies. See *Moran v. Beyer* (7th Cir. 1984), 734 F.2d 1245 (spousal immunity for intentional torts not rationally related to statute's purpose of maintaining marital harmony).

Defendant argues that abolishing the immunity doctrine will allow divorced parents to utilize parent-child negligence litigation as a battlefield for their continuing animosities and promote disharmony between a non-custodial parent and the child. This argument lacks merit. Divorced parents have not taken such advantage of negligence actions which are allowed based on the recognized exceptions to the immunity rule. Nor do divorced parents appear to have taken advantage of the

absence of the immunity rule in third-party contribution situations.

Recognizing that a child's injury is more likely the cause of any family disharmony as opposed to the institution of a suit, defendant also argues that any suit thus serves to exacerbate that existing disharmony and should therefore be disallowed. We disagree. If the injury has disharmonized the family, an action can potentially relieve it. Further, this argument harkens back to the original fiction that regardless of the apparent family disharmony, a suit makes things worse rather than better.

We fully agree with *Schenk*'s attempt to limit application of the parent-child tort immunity doctrine to instances related to the parent-child relationship. *Schenk* correctly recognized that the immunity has traditionally been premised on that relationship. (See Brown, *Prenatal Rights, The Intersection of Parental Immunity and Prenatal Rights: The "Nonfamily Activity" Exception or Traditional Concepts of Negligence?* So. Ill. U. L.J. 749, 755 (1985); 47 U. Colo. L. Rev. at 804 ("The purpose for granting immunity also defines the scope of the exemption").) *Nudd* and *Cummings* also demonstrate that the nature of the conduct necessarily determines the parameters of the immunity. Also, like *Schenk*, we are not convinced that the traditional family harmony rationale affords a sufficient basis for the rule today.

However, also like *Schenk*, we are convinced that the immunity doctrine is supported today by other public policy concerns. Courts should not be involved in deciding matters between parent and child which concern decisions which those persons are uniquely equipped to make because of that relationship; to allow otherwise would unnecessarily and obtrusively inject courts into family matters which they are ill-equipped to decide. Such matters, by definition, involve parental discretion in discipline, supervision and care. Like *Schenk*, we are also convinced that

those underlying policies ought to determine the scope of the immunity.

Unfortunately, as previously stated, *Schenk* is less than clear about the standard which should be applied. Moreover, *Schenk*'s expansive language, focusing on such concepts as "purpose," has lent itself to judicial interpretations which miss the point of the underlying rationale. Given the interpretation problems associated with *Schenk* and its apparent similarity in rationale to the *Gollar* standard, we believe a modification of its exception is appropriate. We wish to clarify the *Schenk* exception so that "purpose" and "objective" are not paramount. We also wish to tailor the exception to conform to standards utilized by jurisdictions which have limited parent-child negligence actions to a more discernible area. The destination of an automobile trip, the location of a vehicle, or the purpose that dangerous substances are kept on household premises should not be determinative of whether an injured child can maintain a negligence action against his parent. The duty which such a child alleges in his complaint is not premised on those facts. The test for the exception to the parent-child immunity should search no further than the duty which is alleged. See 21 San Diego L. Rev. at 343 (discussing refinement of immunity doctrine following *Schenk*).

We believe the more appropriate inquiry, yet based on the *Schenk* rationale, would not concern whether "family purposes" were furthered by a parent's conduct, but whether the alleged conduct concerns parental discretion in discipline, supervision and care of the child. Looking to *Schenk*, *Cummings*, as well as the various foreign jurisdictions, which have grappled with the problem of creating a discernible standard (*Gollar*, *Gibson* and *Holodook*), we conclude that the immunity should afford protection to conduct inherent to the parent-child relationship; such conduct constitutes an exercise of parental authority and su-

pervision over the child or an exercise of discretion in the provision of care to the child. These limited areas of conduct require the skills, knowledge, intuition, affection, wisdom, faith, humor, perspective, background, experience, and culture which only a parent and his or her child can bring to the situation; our legal system is ill-equipped to decide the reasonableness of such matters.

The standard we have thus developed focuses primarily on conduct inherent to the parent-child relationship, which conduct we describe by approximating the *Gollar* standard without its enumerated duties. Such a standard is consistent with other jurisdictions which have abrogated the immunity in order to achieve greater clarity in the area of parent-child negligence. The standard we have created is not, however, as extreme because we do not fully abrogate the immunity, but rely on an exception. Our standard also allows a broader area of negligent conduct to remain immunized. Thus, under our standard, parental discretion in the provision of care includes maintenance of the family home, medical treatment, and supervision of the child. A child may attempt to sue a parent alleging that the child fell on a wet, freshly mopped floor in the home, but the immunity would bar such an action because the parent was exercising his discretion in providing and maintaining housing for the child.

We note as well that parents in Illinois must conform their treatment of their children within certain socially acceptable limits or face criminal and civil actions by the State. Such actions are instituted regardless of the fact that parental authority is thereby circumscribed. Further, there is no immunity as applied to the area of intentional torts. (*Nudd*, 7 Ill. 2d 608.) There yet exist limits to parental authority beyond those recognized here.

In this case, we are asked to consider whether the immunity doctrine bars plaintiff's action which alleged the negligent operation of an automobile by a parent. Apply-

ing the standard we have created, we conclude that the negligent operation of an automobile is not conduct inherent to the parent-child relationship; such conduct does not represent a parent's decision-making in disciplining, supervising or caring for his child. (See *Schneider v. Coe* (Del. 1979), 405 A.2d 682; *Williams v. Williams* (Del. 1976), 369 A.2d 669 (impliedly adopting reasoning in *Schenk* as applied to automobile negligence cases).) The duty which Cates owed in operating his vehicle on State highways was owed to the general public and not to Heather as his child. The negligent operation of a vehicle even when exercising visitation privileges does not constitute conduct inherent to the parent-child relationship. The parent-child tort immunity doctrine cannot be applied to bar a negligence action, alleging such conduct.

We disagree with defendant's argument that eliminating the immunity in automobile negligence cases will threaten parental authority to discipline children or inject courts into matters concerning the exercise of parental discretion. A child's action against her father for the negligent operation of an automobile does not usurp the father's authority to discipline her. Neither does such an action allow a court to second-guess the father's exercise of discretion in day-to-day matters which bear on the parent-child relationship.

We recognize there may be concern that our decision opens the door to litigation between parent and child over ordinary household accidents. There may exist fears that the standard we fashion today would allow a child to sue his or her parent for a slip-and-fall injury caused by freshly mopped kitchen floors; or that parents might collude, purposefully injure a child, and then sue one another on behalf of the child. Such fears ignore the reality that, prior to today, children have been allowed to sue their parents under a variety of circumstances (*Cummings*, 57 Ill. App. 3d 68 (child riding bicycle struck by motorist permitted to sue

parent for failure to trim trees in violation of city ordinance); *Schenk*, 100 Ill. App. 2d 199 (parent-child litigation allowed where negligent operation of automobile alleged because such allegation was unrelated family purpose)), and the reality that other members of a household (brother and sister, husband and wife, child and grandparent) are entirely free to sue one another for similar household slip-and-fall injuries and could also maintain similar collusive actions. Any concerns about judicial involvement in everyday household negligence or over collusive suits would have to be present in the case of these family relationships as well as in those parent-child cases brought under one of the immunity's exceptions. Our courts are not swamped with such negligence actions or with collusive suits between husband and wife, grandparent and child, or sister and brother because the typical homeowners' insurance policy excludes liability coverage for the insured and residents of the insured household. Such policies also generally exclude coverage for liability claims or suits (contribution) brought against any insured by a third party who has injured an insured or a household member. We do not perceive that this situation will change because a child is now able to sue his or her parent. Neither do we perceive that parents will be any more encouraged to present fraudulent claims than would husband and wife, or sister and brother, or that children will be more encouraged to sue their parents than would a husband his wife. The fact remains that where insurance coverage does not exist, there is little motivation to sue. Just as the existence of auto liability insurance has increased the pressures for allowing intrafamily litigation of all kinds in the area of automobile negligence, so the absence of homeowners' insurance liability coverage would appear to stifle intrafamily litigation in this area of negligence.

We further recognize that some Illinois courts have held in several automobile negligence cases that the par-

ent-child tort immunity doctrine operates as a bar to prevent the parent representative of a deceased child's estate from maintaining a wrongful death action against the parent/spouse tortfeasor. (See *Lawber v. Doil* (1989), 191 Ill. App. 3d 323.) The basis for upholding the immunity despite the death of the child was to prevent the tortfeasor from sharing in any benefits which might inure to the tortfeasor because of the marriage between the two parents. We are not here concerned with such actions; such cases may present separate and unique considerations.

In sum, the parent-child tort immunity doctrine developed in an era which was vastly different from the present; our society has changed in myriad and countless ways. The parent-child relationship has been both beneficially and detrimentally affected by these changes. We seek in this instance to uphold and preserve that which forms an integral component of that relationship, parental authority and discretion. Yet, we must also consider the very real needs of our children in today's world. In this regard, we are mindful that the parent-child tort immunity doctrine was created by the courts and it is especially for them to interpret and modify the doctrine to correspond with prevailing public policy and social needs. *Nudd*, 7 Ill. 2d at 619.

Accordingly, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

CHIEF JUSTICE MILLER, dissenting:

I cannot agree with the majority's decision to modify the parent-child tort immunity doctrine. This is a subject appropriately reserved to legislative consideration, and for that reason I dissent.

The majority's discussion of *dicta*, though itself *dictum*, demonstrates the existence of a rule of parent-child tort immunity in this State, a rule that today's decision changes dramatically. As the majority explains, although this court has not specifically held that the rule of immunity governs negligence actions between parent and child, the court has consistently approved that doctrine through judicial *dicta*. (See, *e.g., Gerrity v. Beatty* (1978), 71 Ill. 2d 47; *Mroczynski v. McGrath* (1966), 34 Ill. 2d 451; *Nudd v. Matsoukas* (1956), 7 Ill. 2d 608.) More recently, in *Stallman v. Youngquist* (1988), 125 Ill. 2d 267, this court vacated the portions of a lower court's judgments partially abrogating the immunity doctrine, concluding that an examination of the rule was unnecessary in that case. The appellate court has applied the doctrine in a variety of factual settings (see, *e.g., Davis v. Grinspoon* (1991), 212 Ill. App. 3d 282; *Edgington v. Edgington* (1990), 193 Ill. App. 3d 104; *Lawber v. Doil* (1989), 191 Ill. App. 3d 323); that court has drawn exceptions to the rule in cases in which the tortious conduct fell outside the scope of the parental relationship (*Schenk v. Schenk* (1968), 100 Ill. App. 2d 199) or in which the tortfeasor subsequently died (*Johnson v. Myers* (1972), 2 Ill. App. 3d 844).

In view of these precedents, and of the general nature of the issue before us, I believe that abrogation of the immunity doctrine, whether in whole or in part, should be accomplished through legislative action, and not by judicial fiat. To be sure, the immunity rule was originally a judicial creation, and we do not lack the authority to modify or even eliminate it. But the scope of the immunity protection is fundamentally a question of public policy, and hence a matter that is better resolved by the legislature than by the judiciary. Prudence, and not power, should guide our action here.

Expressions of public policy are found primarily in the constitution and statutes of the State, and only secondarily in its judicial decisions. (*American Federation of State, County & Municipal Employees v. State of Illinois* (1988), 124 Ill. 2d 246, 260; *Kirk v. Financial Security Life Insurance Co.* (1978), 75 Ill. 2d 367, 374; *Routt v. Barrett* (1947), 396 Ill. 322, 340.) The preferred role of the legislature as an expositor of public policy simply reflects the basic principle that a court, constrained by the particularity of the specific controversy before it, is singularly ill-suited to making broad pronouncements of policy. The legislature, with its vastly different functions and resources, is better able to undertake a thorough examination of the different concerns that underlie a matter such as this. The judicial branch is not equipped to perform that mission.

Any change in the area of parent-child immunity implicates a number of important interests. The most significant of these is the traditional responsibility of a parent for deciding questions involving the supervision, care, and control of a minor child. Determining which aspects of that relationship should no longer be immunized requires a careful appraisal of parental obligation in light of modern conditions and circumstances. Moreover, as the majority acknowledges, actions involving parents and children are generally brought because liability insurance provides a potential source of recovery. (156 Ill. 2d at 100-01.) Modification of the immunity doctrine could substantially affect existing underwriting standards and measurements of risk. But the far-reaching effects of today's decision do not even end there. By statute, teachers stand *in loco parentis,* and the provisions of the School Code codifying our traditional immunity rules will also require reexamination. 105 ILCS 5/24—24, 5/34—84a (West 1992); see *Thomas v. Chicago Board of Educa-*

*tion* (1979), 77 Ill. 2d 165; *Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165.

Any doubt that modification of the immunity doctrine is, at bottom, a question of public policy is dispelled by a consideration of the language used in the majority opinion. The very terms employed by the majority in describing developments in this area of the law betray the essentially legislative function being conducted in the present case. Thus, the court declares:

> "A public policy based on the principle of preserving family harmony necessarily argues against every kind of intrafamily litigation. The allowance of a variety of intrafamily negligence actions by exception reveals that the family harmony rationale, an apparently absolute principle, is in fact balanced against other considerations or is not, as a practical matter, a viable consideration. [Citation.] *** [T]he immunity exists only to further the parent-child relationship, and where that relationship is not impacted, the policies supporting the doctrine lose their persuasive strength." 156 Ill. 2d at 98-99.

Making declarations of public policy is primarily a legislative function (see *People v. Felella* (1989), 131 Ill. 2d 525, 539), and I would leave to that branch of government the consideration of changes to the rule of parent-child tort immunity. I do not doubt our power to modify the immunity doctrine, but I must question the wisdom of our doing so. Because I believe that further development in this area of the law should come from the legislature rather than from the courts, I respectfully dissent from today's decision.