# Illinois Official Reports

## Appellate Court

---

### *People v. McKinley*, 2017 IL App (3d) 140752

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES W. McKINLEY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0752 |
| Filed | March 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 13-CF-2454; the Hon. Edward A. Burmila, Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Editha Rosario-Moore, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice O'Brien specially concurred, with opinion.<br>Presiding Justice Holdridge dissented, with opinion. |

**OPINION**

¶ 1    Defendant, James W. McKinley, appeals from his conviction for aggravated driving under the influence of alcohol (DUI) arguing that, during jury deliberations, the circuit court erred in allowing the jury to view the videotape of defendant's traffic stop and field sobriety tests in the courtroom instead of the jury room. We affirm.

¶ 2                                                    FACTS

¶ 3    Defendant was charged with aggravated DUI (625 ILCS 5/11-501(a)(2), (d)(2)(B) (West 2012)). The case proceeded to a jury trial. The only evidence presented at trial was the State's presentation of testimony from two troopers and the patrol vehicle dash camera videotape of the incident.

¶ 4    Jeremy Kunken testified that he had been a trooper for the Illinois State Police since February 2013. During his training at the Illinois State Police Academy, he was trained on DUI detection and enforcement, specifically "[d]etecting the odor of alcohol, the administration of field sobriety tests, and the use of the Intoxilyzer." He was also trained to detect certain "cues and clues" in someone under the influence of alcohol, including red, glassy eyes, the odor of alcohol, slurred speech, and a particular gait.

¶ 5    Kunken stated that on November 10, 2013, he was assigned patrol on Interstate 55. At approximately 1:20 a.m., Kunken observed a black Kia vehicle "driving at a high rate of speed." He clocked the vehicle's speed at 99 miles per hour in a 55-mile-per-hour zone. After he determined the vehicle's speed, he initiated a traffic stop. The vehicle pulled over to the right lane, partially on the fog line. Kunken's vehicle was equipped with video recording equipment, which recorded the traffic stop. He agreed that the videotape was a true and accurate depiction of the traffic stop. Kunken approached the passenger side of the vehicle and identified defendant as the driver. He then asked defendant for his driver's license and proof of insurance. During the encounter, defendant's speech was not slurred, and Kunken did not have any difficulty understanding him. Kunken did not immediately smell alcohol. Defendant handed Kunken his insurance and his work driving permit. Kunken then asked defendant where he was coming from. Defendant stated that he was on his way home from work. Kunken said defendant had first stated that he was coming from work in Burr Ridge and then said Romeoville. Kunken asked defendant if he had been drinking. Kunken asked defendant to exit the vehicle. After defendant exited the vehicle, Kunken observed that defendant's eyes were red and glassy. As Kunken spoke with defendant, he detected a strong odor of alcohol on his breath. Defendant denied consuming alcohol multiple times but then admitted to having two shots of Grey Goose. Defendant ultimately admitted he was coming from a bar in Romeoville, but Kunken did not remember which bar.

¶ 6    Kunken administered field sobriety tests. He first administered the horizontal gaze nystagmus (HGN) test. Based on the HGN test, Kunken determined that defendant had consumed alcohol. He observed, "[t]he lack of smooth pursuit in his eyes, the distinctive and sustained nystagmus and maximum deviation, and [defendant] had nystagmus prior to 45 degrees." While administering the test, Kunken again noticed a strong smell of alcohol. Kunken then administered the walk-and-turn test. Kunken determined that defendant failed the test because "[h]e started before [Kunken] finished giving the instructions. He lost his balance during the instruction phase. He stepped off the line, and he missed heel-to-toe steps. He made

an incorrect turn, and he also used his arms for balance during the test. And he also stopped walking during the test for balance." Kunken also determined that defendant failed the one-leg stand test because "[h]e put his foot down multiple times. He was swaying, and he also used his arms for balance." Based on defendant's performance on the field sobriety tests, the strong odor of alcohol, the admission of drinking, and the red, glassy eyes, Kunken determined that defendant was under the influence of alcohol and unable to operate a motor vehicle. Kunken then arrested defendant. Defendant refused to submit to a breathalyzer test.

¶ 7        Nathan Schramka then testified that he was also a trooper with the Illinois State Police, had been employed as such for seven years, and had undergone specialized training in alcohol and DUI detection, including field sobriety tests. He had made between 275 and 300 DUI arrests. On the night in question, he stopped to assist Kunken. At the scene, he approached the car with Kunken. Schramka also stated that the videotape fairly and accurately depicted the events of the evening. Schramka agreed that defendant stated both that he was coming from Burr Ridge and Romeoville. Once defendant exited the vehicle, Schramka detected a strong odor of alcohol coming from defendant's breath and noticed that his eyes were bloodshot. Defendant first said he had not been drinking and then admitted that he drank two shots of Grey Goose. Schramka stated that he never had a hard time hearing Kunken's instructions to defendant regarding the field sobriety tests. Based on Schramka's observations of defendant, he determined that defendant had failed the field sobriety tests, was under the influence of alcohol, and was unable to safely operate a motor vehicle. Schramka did not make a report, as it was not typical for backup officers.

¶ 8        The videotape showed Kunken pulling defendant over. Kunken then approached defendant's vehicle. Once Kunken was outside the police car, the background noise from the wind and the traffic was a little loud, though the majority of the officer's interaction with defendant could be heard. Kunken told defendant he was speeding, and defendant stated, "I'm just trying to get home, because I know I'm a little late. I'm a little late. I'm trying to get home from work." Defendant said he got off work at 9 p.m. He said he worked in Burr Ridge. Kunken then asked where defendant was coming from at that time. Defendant said he was coming from Romeoville. Schramka noticed that defendant was wearing a wristband and asked where he had been that required wristbands. Kunken said that he did not believe defendant was telling him the truth about being at work. Kunken then had defendant step out of the vehicle. Defendant stated multiple times that he was coming from work. Schramka asked how much alcohol he had to drink, stating that he could smell the alcohol on defendant. Defendant stated that he had not had any. He then admitted to having two shots of Grey Goose about 30 minutes prior. He said he had stopped at the Brunswick Zone after work, which was where he had gotten the wristband.

¶ 9        The videotape then showed Kunken initiating the field sobriety tests. Kunken first had defendant perform the HGN test. Next, Kunken initiated the walk-and-turn test. Kunken told defendant to hold the starting position until he told him to start. Defendant had a hard time remaining in the starting position. Defendant practiced a couple of times to make sure that he was doing it right. He then said that he was having a hard time hearing Kunken. Kunken moved closer and explained. Defendant demonstrated the turn to Kunken to make sure that he was doing it correctly. Kunken showed defendant again. Defendant said he wanted to see Kunken do the whole thing, but Kunken said no because he would then be out in the road, but Kunken showed some steps and turns. Defendant stated he understood what Kunken was telling him to

do. Defendant started once, stepped out, and was not counting the steps. He then started again. Instead of leaving his front foot planted and taking small steps to turn with his back foot, as he was instructed to do, defendant planted his back foot and took small steps with his front foot. Lastly, Kunken administered the one-leg stand test. Defendant started before Kunken told him to. Once he began, defendant forgot to count out loud. He then started and stopped three times. After 12 seconds, defendant again put his foot down, saying that Kunken could "have him count to 100." Kunken said he would not have him count to 100. Defendant started again but again stopped before Kunken told him to. Defendant was then arrested.

¶ 10    The State rested, and defendant did not present any evidence.

¶ 11    While in deliberations, the jury sent a question to the judge asking if jurors could see the videotape again. The judge brought the jury back into the courtroom and said:

"You can see the video again. You can see that we brought the equipment here, and we are going to play that for you momentarily.

Two things that you need to know, however. No one will make any additional comments about the video, and there won't be any questioning of any of the attorneys or anything along those lines. We'll simply play the video, and then you can make whatever observations you would choose to make.

* * *

*** The other thing that I need for you to know is graciously Judge David Carlson has agreed to sit in here and monitor the playing of the video. As I told you, we have two court calls in process. I am going to be across the hall in that courtroom, but you can never have anything occur in a case without a judge being present. And as I said, Judge Carlson has graciously agreed to monitor this for us.

So they are going to set the video up. Judge Carlson will be here in my stead. And, of course, if you have any other questions, provide them to the bailiff and we will address them, okay?"

Defendant did not object. The jury then watched the videotape in the presence of the substitute judge, prosecution, defense attorney, defendant, and bailiff.

¶ 12    The jury found defendant guilty of aggravated DUI. Defendant filed a motion for judgment notwithstanding the verdict or new trial, which was denied. Defendant did not raise an issue with the jury deliberations in his motion. He was sentenced to 54 months' imprisonment. His motion to reconsider sentence was also denied.

¶ 13                                              ANALYSIS

¶ 14    On appeal, defendant argues that the circuit court erred by allowing the jury, while in the midst of jury deliberations, to view the videotape of the traffic stop in the courtroom. Specifically, defendant argues that the jury should have been allowed to view the videotape in the private jury room because viewing it in the presence of defendant, the attorneys, the judge, and the bailiff created a "chilling effect" on the jury. We disagree because we find that defendant was not prejudiced by the jury viewing the videotape in the courtroom where nothing in the record suggests that the presence of others in the courtroom affected the jury in any way.

¶ 15    Defendant acknowledges that he forfeited this issue by failing to object at trial or raise the claim in a posttrial motion. Nonetheless, defendant urges us to consider his claim under the

first prong of the plain-error doctrine, which allows a reviewing court to consider a waived error when the evidence is closely balanced. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The first step in plain-error analysis is determining whether an error occurred. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). The burden of persuasion rests with defendant in plain-error review. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). We begin by examining the applicable standard of review used in determining the existence of error.

¶ 16 At the outset, we note the universally accepted principle that a circuit court has discretion to determine whether to grant or deny the jury's request to review evidence or testimonial transcripts. *People v. Kliner*, 185 Ill. 2d 81, 163 (1998). We also acknowledge that a circuit court is vested with discretion as to what exhibits the jury may have in the jury room. *People v. White*, 2011 IL App (1st) 092852, ¶ 59. Neither of the above scenarios, however, is implicated in the instant case. Here, the parties do not contest the circuit court's discretionary decision to allow the jury to view the videotape again during deliberations. Instead, the present case calls into question the trial court's discretionary manner of allowing the videotape to be viewed by the jury. In determining whether the trial court abused its discretion with regard to this narrow situation, we find guidance in the United States Supreme Court's decision in *United States v. Olano*, 507 U.S. 725, 737-38 (1993), our decision in *People v. Johnson*, 2015 IL App (3d) 130610, and the First District's decision in *People v. Rouse*, 2014 IL App (1st) 121462.

¶ 17 One of the fundamental tenets our judicial system is grounded upon is the mandate that " ' "the deliberations of the jury shall remain private and secret." ' " *Olano*, 507 U.S. at 737 (quoting Fed. R. Crim. P. 23(b) advisory committee's note, quoting *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964)). The primary purpose of this honored rule is to protect the jurors from improper influence. *Id.* at 737-38. In *Olano*, two alternate jurors were permitted to retire with the jury but were cautioned not to participate in the discussions. However, they were present throughout the jury's deliberations. The Court explained: "The question in this case is whether the presence of alternate jurors during jury deliberations was a 'plain error' that the Court of Appeals was authorized to correct under Federal Rule of Criminal Procedure 52(b)." *Id.* at 727.

¶ 18 In addressing the above question, the Court stated: "We generally have analyzed outside intrusions upon the jury for prejudicial impact." *Id.* at 738. Therefore, the presence of a third party in jury deliberations may impinge on the privacy of such deliberations, but reversal is only warranted if prejudice resulted from the intrusion. *Id.* Specifically, the Court noted in theory the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: (1) either because the alternates actually participated in the deliberations, verbally or through "body language," or (2) the alternates' presence exerted a "chilling" effect on the regular jurors. *Id.* at 739. Ultimately, the Court concluded the defendant failed to establish prejudice. *Id.* at 740. The Court also stated: "Nor do we think that the mere presence of alternate jurors entailed a sufficient risk of 'chill' to justify a presumption of prejudice on that score." *Id.* at 741.

¶ 19 In *Johnson*, we were confronted with a similar question as that presented in *Olano*. In *Johnson*, the defendant was convicted of aggravated battery of a police officer. *Johnson*, 2015 IL App (3d) 130610, ¶ 11. At trial, the jury was twice shown a surveillance videotape of the incident. *Id.* ¶ 7. The videotape showed officers restraining and patting the defendant down when the defendant "head-butted" one of the officers. *Id.* ¶ 5. During deliberations, the jury asked to view the videotape again. *Id.* ¶ 9. The circuit court allowed the jury to view the video

in the courtroom in the presence of the judge, prosecutor, defendant, and defense counsel. *Id.* After the jury watched the video, defense counsel filed a motion to allow the jury to take the videotape into the deliberation room, which was denied. *Id.* ¶ 10.

¶ 20  On appeal, defendant argued that the "manner in which the jury was allowed to review the video was presumptively prejudicial because the presence of the judge, attorneys and parties impaired the jury's ability to deliberate and thoroughly examine the evidence." *Id.* ¶ 14. Relying on *Olano*, a divided panel determined that viewing the video in the courtroom in the presence of others was not prejudicial to defendant and that jury deliberation in the presence of nonjury members is not presumed to be prejudicial. *Id.* ¶¶ 19-20. In doing so, the majority stated:

> "The parties discussed the procedure for operating the video equipment, the jury came into the courtroom, they watched the video and they retired to the jury room. The jury's continued deliberation, without requesting to view the video again, indicates that it thoroughly examined and considered the evidence to its satisfaction. Nothing in the record suggests that the judge, the prosecutor, or defense counsel affected the jury's ability to analyze the video evidence." *Id.* ¶ 20.

¶ 21  The defendant in *Rouse* contended that the circuit court's act of requiring the jury to watch surveillance footage in the presence of the parties and the trial judge " 'infringed upon the sanctity and privacy that is so critical to jury deliberations.' " *Rouse*, 2014 IL App (1st) 121462, ¶ 73. In labeling the above issue as one of discretion, the *Rouse* court stated:

> "No one communicated with the jurors while they viewed the recording. After viewing the recording, the jury returned to the jury room to deliberate. Under the record before us, we find no indicia of prejudice or anything improper having occurred during the replay of the surveillance footage." *Id.* ¶ 79.

¶ 22  Applying the reasoning announced in *Olano*, *Johnson*, and *Rouse*, in the absence of actual prejudice we cannot find an abuse of discretion or error. More specifically, we believe that the mode and manner in which a circuit court allows a jury to review a piece of evidence (the video in the instant case) falls directly within the scope of the court's inherent authority to manage its courtroom. See *People v. Coleman*, 358 Ill. App. 3d 1063, 1068 (2005) (holding a circuit court has inherent authority to manage its courtroom and its docket); *cf.* Ill. R. Evid. 611(a) (eff. Oct. 15, 2015) (acknowledging the considerable inherent discretion of the trial court to control all aspects of a trial). We now turn to the question of whether the circuit court committed error or abused its discretion in the instant case.

¶ 23  Here, the circuit court allowed the jury to view the video during deliberations in the courtroom in the presence of a judge, the prosecutor, defendant, defense counsel, and the bailiff. Like in *Johnson*, the record does not show any prejudice to defendant. No one present in the courtroom spoke to the jury while the video was shown. Before showing the video, the judge told the jury that if they had any further questions, they could provide them to the bailiff. The jury did not ask to see any portions of the video again. We cannot say that the presence of the substitute judge, prosecutor, defendant, defense counsel, and the bailiff affected the jury's ability to analyze the video. Defendant has failed to show that he was prejudiced by the circuit court's decision to show the video to the jury in the courtroom, and therefore, we cannot find error or that the circuit court abused its discretion. Although we find no prejudice was shown in this case, thus no error, we would caution circuit courts that the procedure utilized by the court

in the instant case could have the potential of becoming problematic and possibly lead to prejudicial error in some cases. *Cf. Rouse*, 2014 IL App (1st) 121462, ¶¶ 80-82.

¶ 24 In coming to this conclusion, we also reject defendant's argument that the video would have been beneficial to him had the jury had the option to pause and replay portions. Specifically, defendant argues that the video challenges the credibility of the officers because their testimony "distorted [his] response about where he was coming from." In making this argument, defendant relies upon the fact that the officers "could not recall whether defendant had told [them] about Burr Ridge as a response to a question about where his place of employment was located" or whether defendant had said he was coming from Burr Ridge. The video clearly shows defendant was unable to properly complete the field sobriety tests, which was consistent with the officers' testimony. Viewing the video in the private jury room would not have resulted in a different verdict. See *Johnson*, 2015 IL App (3d) 130610, ¶ 20.

¶ 25 Even if we agreed with defendant that it was error to allow the jury to view the video in the courtroom, the alleged error does not rise to the level of plain error.

> "Forfeited errors are reviewable in two instances: (1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48.

¶ 26 Here, the evidence was not closely balanced. Instead, the evidence, from a common sense assessment, of aggravated driving under the influence of alcohol was overwhelming because defendant (1) admitted to drinking Grey Goose, (2) smelled like the alcoholic beverage, (3) had bloodshot eyes, (4) failed the HGN test, (5) failed the walk-and-turn test, and (6) failed the one-leg stand test. See *id.* (contextual analysis of claims that the evidence is closely balanced).

¶ 27 Although not argued, we also find that the alleged error is not a structural error and that the circuit court's decision with regard to the video did not affect the fairness of defendant's trial, nor did it challenge the integrity of the judicial process. See *Thompson*, 238 Ill. 2d at 610-13 (analysis of the type of error that is structural and that undermines the integrity and fairness of the judicial process).

¶ 28                                                    CONCLUSION

¶ 29 The judgment of the circuit court of Will County is affirmed.

¶ 30 Affirmed.

¶ 31 JUSTICE O'BRIEN, specially concurring.

¶ 32 The lead opinion states it "cannot find error or that the circuit court abused its discretion" with regard to the circuit court's decision requiring the jury to view the video, during deliberations, in the courtroom and in the presence of the judge, the prosecutor, defendant, defense counsel, and the bailiff. *Supra ¶* 23. I disagree with this holding and instead believe that it was error to allow anyone to be present with the jury when they viewed the video during their deliberations.

¶ 33 One of the basic tenets of our justice system is that jury deliberations must be private and secret in order to protect the jury from improper influence. *Olano*, 507 U.S. at 737-38. The presence of other parties in jury deliberations may be prejudicial where such presence exerts a "chilling" effect on the jury. See *id.* at 739.

¶ 34 Here, the fundamental tenet of private jury deliberations was violated when the circuit court allowed not only itself but also the prosecutor, defendant, the defense counsel, and the bailiff to be present during said deliberations. The fact that the above parties remained silent during the viewing of the video does not change this conclusion, as deliberations can be disrupted not only via direct interference (*e.g.*, one of the parties audibly offering comment on the video) but also via the mere presence of an outside party. See *Johnson*, 2015 IL App (3d) 130610, ¶ 49 (McDade, J., dissenting) ("it is hard to imagine a more intrusive, more chilling presence in the deliberations than the opposing parties—the defendant with his attorney and the State in the person of the State's Attorney—and the trial judge").

¶ 35 While some may argue that jury deliberations constitute only the actual discussion of evidence and not its mere viewing, I believe this distinction is one without significance. The discussion of evidence is no different than the viewing of evidence, as both occur after the jury is ordered to deliberate, *i.e.*, jury deliberations. Thus, upon a jury being ordered to deliberate, the circuit court must ensure that said deliberations are entirely private. Requiring the jury, in the instant case, to view the video in the courtroom and in the presence of the parties was improper.

¶ 36 Though I would find error, I agree with the majority's *alternative* finding that any error did not rise to the level of plain error. *Supra* ¶¶ 25-27. The evidence was not closely balanced. Nor does the alleged error constitute a structural error. For these reasons, I specially concur in the majority's decision affirming defendant's conviction for aggravated DUI.

¶ 37 PRESIDING JUSTICE HOLDRIDGE, dissenting.

¶ 38 The lead opinion upholds defendant's conviction, finding that there was no error as the trial court had the inherent authority to allow the jury, during jury deliberations, to view the videotape in the courtroom; in the presence of the judge, defendant, defense counsel, prosecutor, and bailiff. *Supra* ¶¶ 22-24. Because I disagree with this holding, I respectfully dissent. Instead, I believe that, though allowing a jury to view evidence in the presence of outsiders is not necessarily error in every case, the facts of the instant case justify a finding of error.

¶ 39 At the outset, I agree with Justice Carter's preliminary position that "the mode and manner in which a circuit court allows a jury to review a piece of evidence (the video in the instant case) falls directly within the scope of the court's inherent authority to manage its courtroom." *Supra* ¶ 22. Unlike the position taken by Justice O'Brien in her special concurrence (*supra* ¶¶ 32-36), I believe there are instances in which a circuit court could allow the jury to view a video in the presence of outsiders without error. Such an instance, however, would require a narrow and specific instruction from the court to the jury. Unlike Justice Carter (*supra* ¶ 23), I do not believe that is what occurred here.

¶ 40 In this case, when allowing the jury to view the videotape in the courtroom, the court stated:

"You can see the video again. You can see that we brought the equipment here, and we are going to play that for you momentarily.

Two things that you need to know, however. No one will make any additional comments about the video, and there won't be any questioning of any of the attorneys or anything along those lines. We'll simply play the video, and then you can make whatever observations you would choose to make."

¶ 41　The above instruction is erroneous in that it lacks specificity and also is confusing. After hearing the instruction, it is reasonable to assume that the jurors would not have known if they were allowed to discuss the video among themselves once they returned to the jury room. I believe this fact, when viewed in conjunction with the fact that the jury was removed from the deliberation room and required to view the videotape in the courtroom and in the presence of the judge, parties, and bailiff, supports the conclusion that the circuit court abused its discretion in the manner in which it allowed the jury to review the videotape. Stated another way, while a circuit court has the inherit authority to control its courtroom, such authority does not excuse conduct that results in the chilling of jury deliberations.

¶ 42　Further, I believe the jury intrusion, coupled with the confusing instruction tendered by the circuit court, was so manifestly erroneous that prejudice should be presumed. In *Olano*, the Supreme Court held that "[t]here may be cases where an intrusion should be presumed prejudicial." *Olano*, 507 U.S. at 739. Justice McDade dissented in *Johnson* and found such presumptive prejudice in a similar situation. In *Johnson*, the court allowed the jury to view a videotape in the courtroom in front of the judge, defendant, defense counsel, and prosecutor. *Johnson*, 2015 IL App (3d) 130610, ¶ 9. "After directing that the jurors should watch the video in the courtroom, the trial judge expressed the opinion that he had to be present because 'it is a session in open court and I am presiding.' " *Id.* ¶ 41 (McDade, J., dissenting). Justice McDade found this error to be presumptively prejudicial, stating: "Although we do not *absolutely* know, it would be unreasonable not to actually find, or at the very least to presume, that the presence of these entities did in fact operate as a restraint upon the jurors' freedom of expression and action." (Emphasis in original.) *Id.* ¶ 51. In doing so, Justice McDade pointed to the statement of the trial court, finding that "it [was] reasonable to presume that, upon adding the presence of the judge, whose avowed intent was to 'preside,' the parties and counsel to [a] controlled environment, the ability of the jurors to freely discuss the details of the video and its possible impact on their decision was inhibited or 'chilled.' " *Id.* ¶ 52.

¶ 43　I adopt the reasoning espoused by Justice McDade in *Johnson* and find that the instruction given by the circuit court in the instant case had a similar effect. The court specifically instructed the jury that "[n]o one will make any additional comments about the video" and they could "make whatever observations [they] would choose to make." Though we cannot be certain that this prevented the jury from discussing the video once they returned to the jury room, we can presume, as Justice McDade did in *Johnson*, that the instruction inhibited the jury's ability to deliberate. See *id.* ¶¶ 51-52. I would presume that the court's erroneous instruction, compounded with the presence of the judge, parties, and bailiff in the courtroom, had a chilling effect on the jury.

¶ 44　Both Justice Carter and Justice O'Brien find that, if there was error, it did not rise to the level of reversible plain error (closely balanced or structural). *Supra* ¶¶ 25-27; see also *supra* ¶ 36 (O'Brien, J., specially concurring). Though I agree that the evidence was not closely balanced, I believe the presumed prejudice, as discussed above, justifies a finding that the error

was structural in nature. Structural error is found "where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Belknap*, 2014 IL 117094, ¶ 48. Here, a clear error occurred. *Supra* ¶ 41. It, further, undermined defendant's right to a fair trial. *Supra* ¶¶ 42-43. The integrity of the judicial process is challenged where jury deliberations are chilled by outside influence.[1] See *Olano*, 507 U.S. at 739. Accordingly, I would reverse defendant's conviction for DUI and remand for further proceedings.

---

[1]Though defendant did not argue structural error, forfeiture is a limitation on the parties, not the reviewing court. See *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. I would also note that the majority addresses the unraised issue of structural error.