# Illinois Official Reports

## Appellate Court

---

***People v. Gore*, 2018 IL App (3d) 150627**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES C. GORE, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0627 |
| Filed | April 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 14-CF-268; the Hon. Walter D. Braud, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Sean Conley, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, Lawrence M. Bauer, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justice Schmidt concurred in the judgment and opinion.<br>Justice McDade specially concurred, with opinion. |

**OPINION**

¶ 1     Defendant, Charles C. Gore, appeals from his convictions for home invasion and aggravated domestic battery. He argues that the circuit court violated his right to a public trial when it closed the courtroom to the public in order to address a question the jury had asked during its deliberations. Defendant also argues that the State's participation in the court's inquiry into his *pro se* claims of ineffective assistance of counsel requires remand for a new *Krankel* hearing. We affirm in part, vacate in part, and remand for further proceedings.

¶ 2                                              FACTS

¶ 3     The State charged defendant with attempted murder (720 ILCS 5/8-4(a), 9-1(a) (West 2014)), home invasion (*id.* § 19-6(a)(2)), and aggravated domestic battery (*id.* § 12-3.3). Collectively, the indictments alleged that Melissa Stenger was a member of defendant's family and that defendant entered Stenger's dwelling place, knowing that she was home, and stabbed her in the neck and chest. Defendant filed a notice of the affirmative defense of self-defense.

¶ 4     The evidence adduced at trial showed that defendant and Stenger had been in a relationship for 14 years and had a 12-year-old daughter together. They ended their relationship in early 2014. Following the separation, defendant briefly lived in the couple's home while Stenger and their daughter lived with Stenger's father. Eventually, defendant moved into an apartment, and Stenger moved back into the home. Stenger believed defendant owed her money for various expenses, including unpaid bills and some of her personal property, which he had not returned.

¶ 5     Stenger testified that the night before the incident in question, she spent time with a man. The man slept over at her house that night. The next morning, after the man had left, Stenger was in the bathroom when she heard the front door to the house unlock. Defendant entered the bathroom and confronted Stenger about the man. Defendant hit Stenger in the head, knocked her down, and began choking her. He dragged her by the hair to the kitchen, where he grabbed a knife from a drawer. They struggled over the knife, and Stenger cut her finger. She distracted defendant by telling him that her father had just arrived at the house. When defendant went to check, Stenger stood up and realized she had been stabbed. She ran to a neighbor who called 911.

¶ 6     Stenger was in the hospital for six days after the incident, recovering from a stab wound to her throat, two stab wounds to her chest, and a cut on her hand. A blood spatter expert testified that blood found on defendant's shoes indicated that the shoes must have been close to the source of the blood.

¶ 7     Defendant testified that he went to the house that morning to retrieve some of his property. Stenger had told him earlier that week that he needed to remove all of his belongings from the house. He knocked and entered the house. Immediately upon seeing him, Stenger demanded the money she was owed. She screamed at him, demanding $800, and grabbed his sweatshirt. When defendant told Stenger he was leaving, Stenger grabbed a knife from the kitchen. She began swinging the knife at him. A struggle ensued, and Stenger pushed defendant over a chair. When defendant got up, he saw a pool of blood. He speculated that Stenger had been stabbed or cut when she was swinging the knife. Defendant was eventually able to leave.

¶ 8     Following closing arguments, the jury retired to deliberate. The court went back on the record when the jury asked a question. The court stated: "They have a question, and I'm

reviewing that question in the presence of the defendant and his counsel and the state's attorney." The question asked, with regard to the attempted murder charge, when the requisite intent had to be formed. The parties agreed that the court would answer the question by telling the jury that "it doesn't matter when [the intent] occurred" and then reading a pattern jury instruction regarding intent.

¶ 9 The jury was brought into the courtroom, at which point the court stated: "Let the record show the jury is in court, but we are, I guess, kind of in open session, because I've closed the courtroom to outsiders. Because the jury has a question, I consider that to be a private matter." The court then answered the question in the manner agreed to by the parties.

¶ 10 Later, the court went back on the record when the jury asked a second question. The court again explained that all parties were present, as was the jury, but "everyone else" had been excluded from the courtroom. The question asked for a transcript of Stenger's testimony. The court informed the jury that there was no transcript, but that the audio recording of her testimony could be replayed if the jury so wished. In a subsequent—apparently written—question, the jury asked specifically whether Stenger had testified that defendant went to the front door before or after the stabbing. The court used this question to narrow down the portion of Stenger's testimony that would be replayed. With the judge and parties still in the courtroom with the jury, the audio recording from portions of Stenger's testimony was replayed.

¶ 11 The jury found defendant guilty of home invasion and aggravated domestic battery, but not guilty of attempted murder.

¶ 12 After the verdict but prior to sentencing, defendant filed a *pro se* motion seeking that the court allow counsel to withdraw and either appoint new counsel or allow defendant to represent himself. In his motion, defendant accused counsel of incompetence, alleging that he had failed to move for a mistrial and to subject the State's case to adversarial testing.

¶ 13 The court heard defendant's complaints at a subsequent hearing it referred to as a "*Franks* hearing." Defendant detailed his allegations against counsel, including counsel's perceived failure to provide him with discovery materials. After a long discussion on the issue that included the State, the court prompted defendant: "[I]s there anything else that [defense counsel] did or failed to do *** that you feel caused him to fall below the standard and that if he had done it right or not done it wrong, it would have changed the jury's verdict?"

¶ 14 Defendant noted that counsel had been on medication, was incoherent, and was "in and out." He continued: "I mean he's missing viable testimony in the trial." The court did not ask counsel to weigh in on this allegation, however, it asked the State for its input. The State's reply, which spans nearly two uninterrupted pages of the report of proceedings, emphasized that counsel had multiple assistants during the trial and that counsel had actually won an acquittal on the attempted murder charge. The State commended counsel's performance at trial.

¶ 15 The court, in turn, commended the performance of counsel's assistants. It further declared: "I really can't make a good argument against his approach because as the prosecutor has indicated, he won." The court ultimately rejected defendant's claim, concluding: "[Counsel] was sick but he put up a hell of a fight and he got a great verdict and I just don't see where he under performed."

¶ 16    The court sentenced defendant to 11 years' and 7 years' imprisonment for home invasion and aggravated domestic battery, respectively.

¶ 17                                    ANALYSIS

¶ 18    On appeal, defendant contends that the circuit court violated his sixth amendment right to a public trial when it excluded the public from the portion of proceedings in which it addressed the jury's questions. Defendant also argues that the circuit court failed to conduct a proper inquiry into his *pro se* claims of ineffectiveness where it invited significant input from the State.

¶ 19                                 I. Public Trial

¶ 20    The United States and Illinois Constitutions both provide criminal defendants with the right to a "public trial." U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Where applicable, the right precludes the closure of a courtroom except where it must give way to an overriding interest, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). Before closing the courtroom, a court must consider alternatives to closure and make factual findings sufficient to support the closure. *Id.* at 48.

¶ 21    In *Waller*, the defendant asserted that his right to a public trial had been violated where the courtroom was closed to the public at his pretrial suppression hearing. *Id.* at 43. Before embarking on its analysis in that case, the United States Supreme Court noted that it had "never considered the extent to which that right extends beyond the actual proof at trial." *Id.* at 44. The *Waller* Court found that the right did apply at a suppression hearing, and it would find 26 years later that it applied to the jury selection phase as well. *Id.* at 46-48; *Presley v. Georgia*, 558 U.S. 209, 212-13 (2010). However, we are aware of no cases that have addressed that question and concluded that the public trial right applies when a court answers a jury's intradeliberational questions. Accordingly, we begin with that threshold question.

¶ 22    Defendant insists this threshold question—whether the public trial right applies when the court answers a jury's question—is directly controlled by Illinois Supreme Court precedent. Specifically, defendant relies upon the case of *People v. Brooks*, 187 Ill. 2d 91, 139 (1999), in which the court wrote:

> "A criminal defendant has a constitutional right to a public trial and to appear and participate in person and by counsel at all proceedings involving his substantial rights. [Citations.] A communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in the defendant's presence, deprives the defendant of those fundamental rights."

In support, the court cited its previous decision in *People v. McDonald*, 168 Ill. 2d 420, 459 (1995), in which it wrote: "[T]his court has held that a communication between the judge and the jury after the jury has retired to deliberate, except one held in open court and in defendant's presence, deprives defendant of those fundamental rights." Nearly identical language appears in *People v. Childs*, 159 Ill. 2d 217, 227 (1994), which cited *People v. Beck*, 305 Ill. 593, 596 (1922). In *Beck*, the apparent starting point for the string of citations culminating in *Brooks*, the court wrote that "[I]t is error for which a judgment will be reversed for a trial judge to hold any

communication with the jury after their retirement to deliberate upon their verdict, except in open court." *Id.*

¶ 23 In *Beck*, the circuit court responded to a jury question by issuing a new (and erroneous) instruction "in the absence of the defendant and his counsel." *Id.* at 595. *Childs*, *McDonald*, and *Brooks*, also concerned *ex parte* communication between the judge and jury following a jury question. Not one of the four cases involved the closure of a courtroom. Furthermore, the courts in *Childs*, *McDonald*, and *Brooks*, each considered whether the *ex parte* communication constituted harmless error. *Childs*, 159 Ill. 2d at 227-28; *McDonald*, 168 Ill. 2d at 460; *Brooks*, 187 Ill. 2d at 139. A violation of the right to a public trial, however, does not require prejudice and is therefore not subject to harmless error analysis.[1] See *Waller*, 467 U.S. at 49-50. In sum, the issue of the public trial right simply had no bearing on any of the cases upon which defendant relies. The passing references to that right were nothing more than *dicta*.

¶ 24 Of course, we would be remiss if we did not acknowledge the possibility that the language in *Brooks* and its predecessors was actually something even less than *dicta*. Black's Law Dictionary provides two separate definitions for the phrase "open court":

"1. A court that is in session, presided over by a judge, attended by the parties and their attorneys, and engaged in judicial business. *Open court* usu. refers to a proceeding in which formal entries are made on the record. The term is distinguished from a court that is hearing evidence in camera or from a judge that is exercising merely magisterial powers. 2. A court session that the public is free to attend. Most state constitutions have open-court provisions guaranteeing the public's right to attend trials." Black's Law Dictionary 1263 (10th ed. 2014).

Given each of the cases in discussion concerned *ex parte* communications, rather than a closing of the courtroom to the public, it is extremely likely that those courts were using the phrase "open court" in the more general sense—the first definition provided in Black's Law Dictionary. Were that the case, the court's language would be completely unrelated to the public trial right, and would not even be considered *dicta* on that topic. Yet, the *Brooks* court does mention the right to a public trial, and we cannot determine with absolute certainty what usage of "open court" was intended. Thus, out of an abundance of caution and to give full consideration to defendant's arguments on appeal, we will proceed under the view that the language in question was *dicta*.

¶ 25 Defendant contends that even if the *Brooks* language is considered *dicta*, it is no less compelling, asserting that the "[d]icta of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court." In support, he argues that "[t]he proposition in question was an integral part of the *Brooks* Court's analysis."[2]

¶ 26 First, we reject the notion that the proposition currently in question played any role in *Brooks*. As we have made clear, the courtroom in *Brooks* was not closed. The right to a public trial was not an issue in that case. The court's only mention of the right was the single sentence

[1]At the time *Beck* was decided, an *ex parte* communication between the judge and the jury did not require prejudice in order to reverse. Of course, that rule has since changed. See *Childs*, 159 Ill. 2d at 227-28 (tracing evolution of harmless error review of *ex parte* communications).

[2]Defendant also asserts that, while the language in *Brooks* may be *dicta*, the case is still relevant in that it "succinctly stated well-established law," namely, *McDonald*, *Childs*, and *Beck*. However, as we have just pointed out, the proposition was *dicta* in those cases just as much as it was in *Brooks*.

that defendant relies upon. Defendant's argument that the right to a public trial nevertheless somehow played an integral role in that case is not well taken. The *dicta* in *Brooks* and the preceding cases was plainly *obiter dicta*. See *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993) (distinguishing *obiter dicta* from the more precedentially valuable judicial *dicta*).

¶ 27 *Obiter dicta*, "as a general rule is not binding as authority or precedent within the *stare decisis* rule." *Id.* As an exception to that general rule, however, our supreme court has held that "[e]ven *obiter dictum* of a court of last resort *can be* tantamount to a decision and therefore binding in the absence of a contrary decision of that court." (Emphasis added.) *Id.* We conclude that the more reasonable course in the present case is to apply the general rule and find the *dicta* in *Brooks* nonbinding. *Brooks* was not a case in which the court conducted an analysis on an issue even though it was not technically relevant to its disposition of the case. In such cases, the *dicta* is, at the very least, supported by a full analysis. In *Brooks*, the court mentioned the public trial a single time, with no analysis. In such a situation, it would be imprudent for this court to elevate such a brief utterance into a settled point of law. The far more prudent course is to proceed as if this is a case of first impression.

¶ 28 In *Waller*, the United States Supreme Court set out a blueprint for determining which portions of proceedings the sixth amendment public trial right might apply to. As we discussed above, the Court found that the right did apply at suppression hearings. *Waller*, 467 U.S. at 46-48. The *Waller* Court began its analysis by quoting a series of cases that had noted " ' "that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." ' " (Internal quotation marks omitted.) *Id.* at 46 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979), quoting *In re Oliver*, 333 U.S. 257, 270 n.25 (1948)). The *Waller* Court further pointed out that "a public trial encourages witnesses to come forward and discourages perjury." *Id.*

¶ 29 The Court found that those aims and interests were equally compelling in hearing a motion to suppress seized evidence as they are in the trial itself. *Id.* The Court continued:

"In addition, a suppression hearing often resembles a bench trial: witnesses are sworn and testify, and of course counsel argue their positions. The outcome frequently depends on a resolution of factual matters. [Citation.] The need for an open proceeding may be particularly strong with respect to suppression hearings. A challenge to the seizure of evidence frequently attacks the conduct of police and prosecutor. As the Court of Appeals for the Third Circuit has noted, '[s]trong pressures are naturally at work on the prosecution's witnesses to justify the propriety of their conduct in obtaining' the evidence. [Citation.] The public in general also has a strong interest in exposing substantial allegations of police misconduct to the salutary effects of public scrutiny." *Id.* at 47 (quoting *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 605 (3d Cir. 1969)).

¶ 30 In *Presley*, the Court found a sixth amendment right to a public trial during the *voir dire* of prospective jurors, relying wholly on *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984), in which it held that *voir dire* must be open to the public on first amendment grounds. The *Press-Enterprise* Court, in turn, relied in part on the " 'community therapeutic value' " inherent in open proceedings. *Id.* at 508 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570 (1980)). The Court concluded that "public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected." *Id.* at 509.

- 6 -

¶ 31       Few of the concerns identified by the *Waller* or *Press-Enterprise* Courts are present in this case. In the context of a judge answering an intradeliberational jury question, there is absolutely no concern for perjury or for encouraging witnesses to come forward. No one is sworn in, and no one testifies. There are no facts adduced, and in turn, nothing turns on resolution of any factual questions. The proceeding, unlike a suppression hearing, does not resemble a bench trial in any way. Further, there is no specific, self-evident public interest, such as the public's interest in police conduct at issue in a suppression hearing or the public's interest in knowing that a particular jury is fairly and openly selected.

¶ 32       To be sure, the *general* public interest discussed in *Waller* is present any time the judge or prosecutor takes any action. However, if the *Waller* Court had intended that to be the standard for determining where the public trial right applied, its analysis would have been significantly shorter. As an example, grand jury proceedings represent an instance where a prosecutor is engaged in official conduct, yet no one could reasonably argue that the public trial right would apply there. Moreover, the actions taken by the court and prosecutor in this case were minimal. After a brief discussion, the court read a pattern jury instruction back to the jury. Later, the court and parties sat silently while audio of testimony from the trial was played. While defendant asserts that the question of how to present evidence to a jury in the middle of deliberations is "often contentious," that is simply not borne out by the record before us. Thus, the public's interest in ensuring the court and prosecutor execute their duties properly is less where those duties are minimal compared to the more significant portions of a trial.

¶ 33       Further, there are affirmative reasons that the public trial right should not apply in the present context. It is axiomatic that the deliberations of a jury are to remain private and secret in order to insulate the jury from improper influence. *United States v. Olano*, 507 U.S. 725, 737-38 (1993). Based on this principle, this court has found error where a courtroom is open even to the parties when a jury must return to the courtroom during its deliberations to review evidence, with those courts proceeding straight to a prejudice analysis. See *People v. McKinley*, 2017 IL App (3d) 140752, ¶¶ 22, 32, 38 (two justices finding error and two justices finding no prejudice); *People v. Johnson*, 2015 IL App (3d) 130610, ¶¶ 20, 39 (majority affirming based on lack of prejudice; dissenting justice finding prejudicial error); see also *People v. Gleason*, 36 Ill. App. 2d 15, 17 (1962) (reversing on the grounds that the bailiffs' presence in courtroom while jury deliberated in courtroom "may have had an effect never accurately ascertainable because perhaps not consciously known to the jurors themselves. The risk involved in such practice is far too great to be tolerated.").

¶ 34       In the present case, defendant does not argue that it was error for the court and parties to be present while the jury reviewed Stenger's testimony. Indeed, he argues that *more* people should have been welcomed into the courtroom while the court answered the jury's questions. While we agree with defendant that the jury's act of asking a question naturally invites a third party into the fold at the deliberative stage, it is reasonable that the variables that might subconsciously influence the jury at that stage be minimized as much as possible. The presence of friends and family—of either a defendant or victim—or the media when a jury must return to the courtroom in the middle of its deliberations present no obvious benefits; rather, as suggested in *Olano* or *Gleason*, it is more likely to influence the jury in a way that undermines a defendant's right to a fair trial.

¶ 35       In sum, we find that a criminal defendant's right to a public trial is inapplicable to a portion of proceedings in which the circuit court must answer the jury's intradeliberational questions.

Accordingly, we find that the court in the present case did not violate defendant's rights or otherwise commit error when it closed the courtroom in that context.

¶ 36                                    II. *Krankel*

¶ 37        The proper procedure to be followed where a defendant makes *pro se* posttrial claims of ineffective assistance of counsel is set forth in *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. Those cases make clear that the circuit court should conduct a preliminary inquiry into defendant's claims—often by way of addressing defendant and counsel—and, if there is an indication of possible neglect of the case on counsel's part, the court should appoint new counsel to fully pursue defendant's claims. *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991).

> "[A] preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding. Because a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the State's participation at that proceeding, if any, be *de minimis*. Certainly, the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry." *People v. Jolly*, 2014 IL 117142, ¶ 38.

The *Jolly* court noted that "the purpose of *Krankel* is best served by having a neutral trier of fact initially evaluate the claims at the preliminary *Krankel* inquiry without the State's adversarial participation, creating an objective record for review." *Id.* ¶ 39.

¶ 38        The State first argues that its participation in the first *Krankel* inquiry was *de minimis*. We reject this argument. After the court invited the State's opinion, the State spent nearly two uninterrupted pages of record arguing vociferously against defendant's claims and in support of defense counsel. The State's argument included that tenuous point that counsel could not have been ineffective because he had achieved an acquittal on one of the three charges. The court referenced this when it ruled, stating: "I really can't make a good argument against [defense counsel's] approach because as the prosecutor has indicated, he won." The *Krankel* inquiry had clearly turned into an adversarial proceeding, undermining the possibility of creating a neutral, objective record for review.

¶ 39        The State next argues that, even if error occurred, it was harmless beyond a reasonable doubt because the court ultimately relied upon its own observations in denying defendant's claims. That argument, however, is foreclosed by the decision in *Jolly*, in which our supreme court rejected the notion that a *Krankel* inquiry conducted in adversarial fashion could be considered harmless error. *Id.* ¶ 40. The court pointed out that while the circuit court's substantive denial of new counsel following a *Krankel* inquiry may be harmless error, the improper nature of the inquiry itself may not be, as it completely deprives a reviewing court of a neutral, objective record. *Id.* ¶¶ 42-44. Accordingly, we vacate the circuit court's dismissal of defendant's allegations of ineffective assistance of counsel and remand the matter so that the circuit court may hold "a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation." *Id.* ¶ 46.

¶ 40                                    CONCLUSION

¶ 41        The judgment of the circuit court of Rock Island County is affirmed in part, vacated in part, and remanded with directions.

¶ 42          Affirmed in part, vacated in part, and remanded with directions.

¶ 43          JUSTICE McDADE, specially concurring:

¶ 44          The majority affirms defendant's convictions, finding that the right to a public trial does not extend to the phase of proceedings in which the court considers and answers questions asked by the jury during deliberations. I concur with this finding and result. I would add only the observation that the consideration of issues arising during the trial concerning whether certain evidence should be heard by the jury is a process often undertaken via sidebar between the court and the trial attorneys. In such instances, even where the public is not explicitly barred from the courtroom, it is rarely privy to such interactions.

¶ 45          I write separately to express my concerns with the methods employed by the circuit court in this case. The record shows that only the public was excluded from the courtroom when the audio recording of Stenger's testimony was replayed for the jury. The judge, defendant, attorneys, and presumably a court reporter, clerk, and bailiff remained in the courtroom. As the majority points out, this court has previously found error in such situations. See *supra* ¶ 33.

¶ 46          In *Johnson*, 2015 IL App (3d) 130610, video evidence was replayed during jury deliberations, in the presence of the prosecutor, defense counsel, and defendant. While the court unanimously found error, the majority affirmed defendant's convictions based upon a lack of prejudice. *Id.* ¶ 20. In dissent, I wrote:

               "[T]he viewing of the video in the presence of the judge, the parties and counsel clearly violates the ' "cardinal principle that the deliberations of the jury shall remain private and secret." ' [Citation.] *** [I]t is hard to imagine a more intrusive, more chilling presence in the deliberations than the opposing parties—the defendant with his attorney and the State in the person of the State's Attorney—and the trial judge. For the reasons that follow, I would find this violation amply, compellingly justifies a finding of presumed prejudice." *Id.* ¶ 49 (quoting *Olano*, 507 U.S. at 737, quoting Fed. R. Crim. P. 23(b), Advisory Committee Notes (1983 Amendments)).

¶ 47          The same is no less true in this case. The jury here was compelled to conduct a portion of its deliberations in the presence of interested parties, among others. It would be unreasonable to not presume that the presence of these persons acted as a restraint upon the jurors' freedom of action and expression. Of course, defendant does not make this argument, actually arguing instead that *more* people should have been in the courtroom at that moment. This court, however, will not search the record for unargued and unbriefed reasons to reverse the circuit court's judgment. *People v. Givens*, 237 Ill. 2d 311, 323 (2010). Accordingly, I must concur in the result reached by the majority.